[Civ. No. 10883.   Third Dist.   Nov. 19, 1965.]

STEPHEN ENGLE et al., Plaintiffs and Respondents, v.
CITY OF OROVILLE, Defendant and Appellant.

Carl O. Ohmer, Robert V. Blade, Perry M. Farmer and Blade & Farmer for Defendant and Appellant.

Robert E. Laughlin for Plaintiffs and Respondents.

PIERCE, P. J.—By its judgment after a bifurcated trial the trial court (1) permanently enjoined defendant city from "discharging sewage effluent from the sewage plant of the City of Oroville into the Feather River," and (2) awarded plaintiffs damages of $11,000. The first phase (in which plaintiffs' right to injunctive relief was decided) was tried by the court. The issue of damages was determined (in the second phase) by a jury after an abortive appeal to this court on plaintiffs' right to an injunction had been dismissed as premature.

Defendant urges a number of assignments of error, only two of which need consideration herein since these two assignments have merit, require a reversal with directions, and therefore dispose of the litigation. ██ █ The questions we answer are:

(1) Where, during the course of litigation and before final judgment, the conditions upon which an injunction has been

issued no longer exist and cannot recur should the injunction be dissolved?

(2) Must a judgment for damages be reversed with directions where the only evidence relevant to damages was an alleged loss of prospective profits: (a) from an unexecuted lease of property; (b) to a prospective tenant not shown to have had any ability to consummate the lease; and (c) where there was no showing that the acts of defendant were the proximate (or any) cause of the prospect's failure to enter into the lease?

We answer both questions in the affirmative.

### Re: The Question of the Injunction

The lands which are now plaintiffs' are riparian to the Feather River. They are located one mile downstream from the City of Oroville and one-quarter mile downstream from the sewage plant of the city in use until July 1960.

This plant was inundated by the great flood on the Feather River in December 1955. When the waters receded huge deposits of sand and silt remained: e.g., 6 to 8 feet of sand filled the percolation ditches.

Because of the conclusions we reach in this decision it is unnecessary to relate in detail the repeated efforts during 1956, 1957 and 1958 by defendant to contain sewage effluent from the plant and cause it to seep harmlessly into the soil before reaching the river. Although there is a sharp conflict in the evidence in this regard, substantial evidence supports the trial court's finding that before and up to, the time of the first phase of the trial on the injunction in November 1959 some sewage effluent from the plant did reach the river and pollution resulted, extending to the waters opposite the lands now belonging to plaintiffs. Plaintiffs purchased those lands in May 1957.

The record shows no deliberate, wilful, reckless or indifferent attitude on the city's part. Repeated efforts were made to solve the problem. And ultimately a plan for a new sewage plant was completed, the plan was submitted to the electors, bonds were voted and a new sewage plant was built. It was completed in July of 1960 and the old plant was abandoned. This new plant is below plaintiffs' property, is located inland and is so constructed that effluent can no longer reach the river. There has been a permanent cessation of pollution.

These facts, well supported by the record, are not disputed by plaintiffs.

Meanwhile, in June 1958, this action had been filed, the injunction phase of the trial was held in November 1959 and the court's findings were made on April 1, 1960. As indicated above, on this date the nuisance found by the court to exist was continuing. It continued until July 1960.

The city attempted an appeal to this court from the order directing the issuance of an injunction. On May 3, 1961, that appeal was dismissed as premature since the issue of damages was still undetermined. (See *McCarty* v. *Macy & Co.,* 153 Cal.App.2d 837, 840 [315 P.2d 383].)

On remand pretrial proceedings preparatory to the damage trial were held. On August 30, 1961, defendant moved for an order dissolving the injunction theretofore issued upon the ground that the abandonment of the old sewage plant and the construction of the new one made continuance of the injunction unnecessary. After hearing the motion the court deferred its ruling thereon until the jury's verdict on the damage issue and entry of the final judgment.

That judgment was filed January 2, 1963. On February 8, 1963, combined motions (1) for a new trial, (2) for judgment notwithstanding the verdict, and (3) the long-pending motion to dissolve the injunction, were heard together. All motions were denied. The minute order dated March 8, 1963, denying the motion to dissolve the injunction, recites: "It was made prior to Judgment herein and, therefore, in effect, amounted to a request for Court to change its findings re: injunctive relief prior to entry of judgment. This denial is without prejudice to the refiling of a new Motion to Dissolve Injunction, as set forth in the present Judgment."[1]

The trial court was correct in its statement that the proof justified the original findings that plaintiffs were then entitled to an injunction. It erred, however, in its assumption that defendant's motion amounted to a request to the court to change its earlier findings.

---

[1] The judgment contained the following provision: "It Is Further Ordered, Adjudged and Decreed that this be retained by the court for further orders should the same be deemed necessary in the future."

Defendant, undoubtedly at a loss as to how it could avail itself of its right to renew its motion for a dissolution of the injunction before the trial court and at the same time not lose by lapse of time its right to appeal from the judgment granting the injunction, filed its notice of appeal. This, of course, deprived the trial court of further jurisdiction. (Code Civ. Proc., § 946.)

Equity acts in the present tense and not in the past tense. (*Mallon* v. *City of Long Beach,* 164 Cal.App.2d 178, 188 [330 P.2d 423].) ■ An injunction will not be granted where, at the time of the hearing, conditions have so changed that no unlawful act is threatened. ■ The injunctive power is not wielded as a punishment for past acts. It will be exercised only when there is evidence the acts enjoined will probably recur (*Mallon* v. *City of Long Beach, supra*; see also *Sontag Chain Stores Co.* v. *Superior Court,* 18 Cal.2d 92 [113 P.2d 689]).

■ While, as plaintiffs point out, in the foregoing cases it was the trial court which had refused to issue a permanent injunction under the circumstances described, the principles do not change by reason of the stage of the litigation at which they are invoked. It has been held that where the ultimate facts are undisputed the question of whether a permanent injunction should issue becomes one of law and the *appellate* court may determine the issue without regard to the conclusion of the trial court. (*Eastern Columbia, Inc.* v. *Waldman,* 30 Cal.2d 268 [181 P.2d 865].) It has also been held that since relief by injunction operates in futuro the right thereto must be determined as of the date of decision by an appellate court. (*American Fruit Growers, Inc.* v. *Parker,* 22 Cal.2d 513, 515 [140 P.2d 23].)

■ Applying these rules to the facts of the case at bench, we can find no justification to retain in effect an injunction which can serve no useful purpose and the existence of which can only prove irksome to future city administrations which, so long as the injunction exists, will be subject to being brought into court upon vexatious proceedings in contempt.

. The city was guilty of no bad faith here. The nuisance was abated apparently as rapidly as the not-always-smooth governmental process would permit; there appears no possibility the nuisance will or can recur and the injunction should be dissolved. We so hold.

### RE: THE QUESTION OF DAMAGES

When in May 1957 plaintiffs acquired their property they commenced to improve it. They remodeled the home already on the property. They built a "short order" restaurant. By the spring of 1958 they had commenced the excavation of an estuary out into the river where they apparently intended to provide recreational facilities, including a beach, facilities

for the berthing of boats, water skiing, etc. They also planned the construction of a trailer court. (This has since been built.)

At the trial plaintiffs made no claim that they had suffered any damage by defendant's acts in connection with any of the foregoing uses of their property. Instead they repeatedly asserted sole reliance upon a loss of expected profits from an asserted single enterprise, the facts concerning which were as follows: Plaintiff Engle testified that a number of investors had shown an interest in the construction of a motel on the property. Apparently, one of these was Albert Martin. His name was first mentioned on cross-examination, when defense counsel brought out that during discovery proceedings in answer to interrogatories plaintiffs had listed as one of their expenses in developing the property "Setting up corporation, Albert Martin, $25,000.00, to be reimbursed in form of stock." Asked about this, Engle admitted the inaccuracy of the item. He stated that Martin contemplated the setting up of a corporation which would lease the motel from Engle and that "in the event he, he did set it up, the corporation, he was going to be repaid in the way of stock. . . ." In a part of his deposition (read into the record) Engle had testified he had felt a "moral obligation" to Martin because of the work he had done. He said written instruments had been written up but had not been signed and that he was not under any "legal obligation" to him. Negotiations had continued with Martin over a period of nine months. Apparently no corporation was organized; no stock subscribers were found.

During the same period Engle was carrying on negotiations with M. E. Gibson of Sacramento. Engle described him as an "investor."[2] Engle had met Gibson on a hunting trip and had shown him plans he had had prepared by an architect for the construction of the motel. Gibson had visited the property a number of times, and, according to Engle, "as a result of that we were just about to the point to formalize an agreement . . . on a ground lease." The lease was to be for 50 years with a ground rent of $1,000 per month net to the Engles, the rent to commence upon ground breaking. Other details of the agreement were not mentioned. No agreement in writing was ever signed.

[2]Mr. Gibson was not a witness at the trial. Explaining his absence (out of the presence of the jury) plaintiffs' counsel stated to the court that Gibson, employed by a Sacramento jewelry firm, would lose his job if he was called to Oroville to testify.

In April 1958 the Butte County Health Department posted signs on plaintiffs' property and in the surrounding area stating that the river was "contaminated by sewage discharge" and forbidding swimming, skiing and wading. These signs remained until early 1959 when they were removed.

Respondent's brief states: "Gibson gave up the project because of the posting of the river." We find no evidence in the record which supports that statement. The evidence is that Mr. Gibson was on the property in April of 1958 after the signs were posted and that Engle was never contacted by Gibson "as far as this agreement was concerned" thereafter. The record is devoid of evidence as to the reason Gibson lost interest in the project. Plans for the construction of a motel were abandoned. The trailer camp, however, was constructed.

The fundamental rules applicable to the award of damages for loss of profits has been stated by our Supreme Court in *Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193 [143 P.2d 12], where the court (per Justice Traynor) states on page 199 that such award "depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort. If no such basis exists, as in cases where the establishment of a business is prevented, it may be necessary to deny such recovery. [Citations.] If, however, there has been operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of prospective profits are awarded. [Citations.]" In the same opinion it is stated on page 200: ". . . Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated." These rules were reasserted by this court (per Justice Van Dyke) in *Guttinger* v. *Calaveras Cement Co.,* 105 Cal.App.2d 382 [233 P.2d 914].

Speaking even more fundamentally, the First District Court of Appeal (per Justice Molinari) in *Frustuck* v. *City of Fairfax,* 212 Cal.App.2d 345, at pages 367, 368 [28 Cal.Rptr. 357], said recently: ". . . Whatever the proper measure of damages may be, in a given case, the recovery therefor is still subject to the fundamental rule that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery. [Citations.]" Loss of profits which exist "only in the fond dreams of the adventurer" will not support a verdict for damages. (*Lacy Mfg. Co.* v. *Gold Crown Mining Co.,* 52 Cal.App.2d 568, 574 [126 P.2d 644].) It has been pointed out, however, that although evidence to establish prospective profits must not be uncertain or specu-

lative, "This rule does not apply to uncertainty as to the amount of profits which would have been derived, but to uncertainty or speculation as to whether the loss of profits was the result of the wrong and whether any such profits would have been derived at all." (*Continental Car-Na-Var Corp.* v. *Moseley*, 24 Cal.2d 104, 113 [148 P.2d 9]; see also *Myers* v. *Stephens*, 233 Cal.App.2d 104, 118 [43 Cal.Rptr. 420].)

Section 912 of the Restatement of Torts states: "A person to whom another has tortiously caused harm is entitled to compensatory damages therefor if, but only if, he establishes by proof the extent of such harm and the amount of money representing adequate compensation with such certainty as the nature of the tort and the circumstances permit." Under comment d there is a statement upon which plaintiffs rely (at p. 579): ". . . Where the tortfeasor has prevented the beginning of a new business or the prosecution of a single transaction, all factors relevant to the likelihood of the success or non-success of the business or transaction which are reasonably provable, are to be considered, including general business conditions and the degree of success of similar enterprises." But this statement continues: "Because of a justifiable doubt as to the success of new and untried enterprises, more specific evidence of their probable profits is required than where the claim is for harm to an established business." Also added is the statement that the burden is on the injured person to prove with a fair degree of certainty that the business or transaction was or would have been profitable.

Attempting to meet the burden in this case plaintiffs produced two witnesses. (Appellant challenges their qualifications as experts but we will assume they qualified.) The testimony of one was IF a motel of the class described were to be constructed on plaintiffs' property, which was peculiarly suitable for such a use, a reasonable ground rent would be $1,200-$1,500 per month. The other testified to a reasonable ground rental of $1,000. Both stated that the property would not be merchantable for such a purpose during any period when the river area was posted as being polluted.

The vice of all of plaintiffs' evidence was that it was—without alleviation—conjectural, remote, contingent and speculative. One of plaintiffs' experts testified that it would cost $600,000 to construct the type of "deluxe" motel which plaintiffs had in mind (and which their experts had in mind when they testified to the profits plaintiffs would have realized had such a motel been built). There was no evidence that either Gibson, Martin or any other person, or combination of persons,

seen by Engle could finance such a motel. Engle testified that he had investigated Gibson's financial position and no evidence was produced showing the results of that investigation. Nor was there any evidence that Gibson, assuming his ability to finance the building of such a motel, would have consummated an agreement but for the posting of signs by the county health department. There is only evidence that discontinuance of negotiations coincided with the posting. The possible reasons therefor were infinite. In this regard the very first questions asked of plaintiff Engle on cross-examination are significant. It appeared that another motel, "Prospector's Village," conceded by Engle to be "a deluxe motel of the same general type and character as the type [he had] been describing proposed for [his property]," had been completed at approximately December 1957. Engle was asked these questions: "Q. In May of 1957, Mr. Engle, you did not believe that the Oroville area would support two deluxe motels of the type you were talking about here, do you? A. In May of 1957. Q. Yes? A. No. Q. And you don't believe that it would support two motels of that type at any time since to the present time, do you? A. Up until the present time, no." Whether or not Engle's judgment was correct is not material. It is suggested, however, that the existence of the other motel as a possible factor discouraging Gibson as an entrepreneur of Engle is at least as reasonable a speculation as any other.

We hold that plaintiffs' evidence of loss of prospective profits was too speculative to form a basis of permissible recovery. We summarize our reasons already discussed: (1) plaintiffs did not have a contract for the construction of the projected "single venture," to wit, the motel; (2) they did not have a prospect of such a contract with a person shown to be capable of financing one; and (3) they did not have a prospect shown to have been ready and willing to build such a motel.

Since no other damages were sought or proven and since in a tort action "nominal damages to vindicate a technical right cannot be recovered . . . where no actual loss has occurred" (*Frustuck* v. *City of Fairfax, supra,* 212 Cal.App. 2d 345, 368) reversal of this action must be with directions.

The judgment is reversed and the cause is remanded with directions to the trial court (1) to dissolve the permanent injunction heretofore issued, and (2) to enter judgment for defendant on the issue of damages. We leave undisturbed the trial court's award of costs to plaintiffs on the first phase

of the trial and reverse and allow costs to defendant on the trial on the issue of damages. Defendant shall recover costs on appeal.

Friedman, J., and Regan, J., concurred.