[No. B147455. Second Dist., Div. Five. Jan. 30, 2002.]

KIDS' UNIVERSE et al., Plaintiffs and Appellants, v.
IN2LABS et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Edward A. Hoffman, Edward A. Hoffman; Law Offices of Bernie Bernheim, Bernie Bernheim and David C. Parisi for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold and Robert F. Helfing for Defendants and Respondents.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Plaintiffs, Kids' Universe, and Lew and Howard Rudzki,[1] appeal from a summary judgment in favor of defendants, In2Labs and Conrad Salindong.

---

[1] For purposes of clarity and not out of any disrespect, Lew and Howard Rudzki will be referred to individually by their first names.

Plaintiffs sought lost profits on the theory defendants negligently caused a flood in the Kids' Universe retail store and prevented them from launching an internet Web site for the sale of toys. The trial court found plaintiffs could not establish with the requisite certainty that profits would have been made from the operation of the on-line business. We conclude defendants met their summary judgment burden as to the entire damage element of plaintiffs' cause of action which sought only lost profits. Further, because of the speculative nature of their evidence, we conclude plaintiffs failed to raise a triable issue of material fact as to their ability to prove lost profits. Accordingly, we affirm the summary judgment.

## II. FACTS

The material facts are undisputed.[2] Two brothers, the Rudzkis, founded Kids' Universe in 1992. Kids' Universe is a retailer of toys, educational products, and computer training services for children. Kids' Universe operates a retail store in Beverly Hills.

Defendants leased office space directly above the Kids' Universe store. On November 18, 1997, one of defendants' employees left water running in a sink overnight, causing a flood in plaintiffs' store. The store remained closed due to flood damage for two weeks. When the store reopened, many of its shelves were empty. Further, computer classes, an important factor in the store's profitability, could not be resumed until January 1998. The store was not operating at its previous level until April 1998. Defendants, through their insurer, paid plaintiffs $200,000 for damage to the retail store.

Defendants presented evidence Kids' Universe had no line of credit available to it during 1997 and 1998. Kids' Universe had never attracted any investors. At the time of the flood, Kids' Universe had five employees, only one of whom had a sales position.

Kids' Universe had started a Web site in the spring of 1995. Howard described the Web site as a "test" site; a way to learn about the Internet and e-commerce; to experiment with Web designs and to "debug" the Internet Web page. Howard stated the on-line business originally was not intended to

---

[2]Defendants objected to evidence plaintiffs relied on in opposition to the summary judgment motion. However, the trial court failed to rule on those objections. Moreover, defendants' counsel did not orally request a ruling on the objections at the hearing on the motion. At the conclusion of the hearing, the matter was submitted. Because defendants' counsel failed to obtain a ruling on the objections, they are waived; this court must view all of the evidence as having been admitted. (Code Civ. Proc., § 437c, subds. (b) & (c); *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65-66 [99 Cal.Rptr.2d 316, 5 P.3d 874]; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

be profitable. In fact, the online business generated less than $500 per year with the exception of one order for approximately $17,000. Between 1995 and 1997, Kids' Universe repeatedly revised its Web site.

Plaintiffs presented evidence that by November 1997, when the flood occurred, the Rudzkis had developed a sophisticated Web site. As described by Lew, the new Web site "had one of the first online 'shopping carts' on the [W]eb (this was the beginning of 'e-commerce'), a state of the art navigational system, and was a full functioning site." Plaintiffs had incurred significant time and expense in drafting the programming code for and designing their "state of the art" Web site. They had hired a Web site design company and a development programmer. The new Kids' Universe Web site was "very similar" to the eToys site. The new Web site was scheduled to go on-line on Thanksgiving Day 1997, the start of the holiday shopping season and the most profitable time of year in the toy business.

In addition, prior to the flood, plaintiffs had signed a one-year contract with MindSpring, described as one of the "fastest growing" Internet service providers with "a relatively wealthy base of subscribers." Plaintiffs presented evidence of an agreement between MindSpring and Kids' Universe. The agreement was signed by Howard *only* and not by any MindSpring representative. Under the terms of the agreement, MindSpring's 200,000 subscribers would have direct, one-click access from its homepage to three toy Web sites—eToys, F.A.O. Schwartz, and Kids' Universe. According to Howard: "This was a key place to be because Kids' Universe would be highly visible to people who entered the site. Just as location has always been critical for a retail business, the same holds true for the [I]nternet." Further, Kids' Universe would not have been required to make any up-front payment to MindSpring. Instead, Kids' Universe would have paid commissions to MindSpring "based on a percentage of sales made from the MindSpring placement."

At the time of the flood, Kids' Universe was also negotiating an arrangement with WeatherChannel.com to establish a link similar to the MindSpring link. WeatherChannel.com was then one of the "highest trafficked sites" on the Internet. Howard opined, "For Kids' Universe to have placement on the WeatherChannel site would assuredly guarantee a very high number of visitors to the Kids' Universe [Web site]."

Kids' Universe also intended to market its Web site through contacts at magazines as well as radio and television stations. Kids' Universe was prepared to fill orders placed over the Internet. It had "drop shipment" agreements with numerous suppliers, i.e., the manufacturers agreed to ship

products directly to Kids' Universe's customers. In addition, Kids' Universe was prepared to ship products directly from the retail store.

However, the flood caused extensive damage to the retail store. The Rudzkis were forced to devote their time to rebuilding and restocking the store. For a variety of reasons, they were unable to both rebuild the store and launch the Web site. Unable to launch their new Web site, plaintiffs withdrew their contract with MindSpring and did not follow through on the WeatherChannel agreement.

Prior to the flood, plaintiffs were able to obtain revenue-sharing agreements with Web site portals such as MindSpring without paying money up front. According to Lew, this was because "the [Web site] portals had not yet recognized their value." In March 1998, the Kids' Universe retail store was reestablished and plaintiffs once again set their sights on e-commerce. By that time, however, revenue-sharing Web portal arrangements were no longer available. Following the success of e-commerce retailers like eToys and Amazon, large amounts of cash up front were demanded in return for access to Web site portals. The fees often exceeded $1 million. Plaintiffs were financially unable to proceed; the Web portal costs were "exorbitant." Without links on popular Web site portals, plaintiffs were unable to attract customers to the Kids' Universe Web site.

Lew, who had a bachelor of arts degree in finance and five years' experience in the toy business, described investment opportunities in the industry during 1997 as follows: "In 1997, as an industry standard, there was not a traditional profit structure, but a valuation structure that created the ability to go out and receive capital to expand the business on favorable terms. In other words, profits were generated by a compan[y's] valuation and the compan[y's] value was based on its ability to attract customers to the site. Once Kids' Universe's value was established, i.e., we proved that we could significantly attract customers and had a viable on[-]line business, we would be able to obtain significant venture capital."

In March 1999, Richard X. Hanson, a forensic economist, prepared at plaintiffs' request a "preliminary analysis of losses suffered by [Kids' Universe] as a result of the flooding incident . . . ." It is apparent the analysis was prepared for settlement purposes. Dr. Hanson opined in pertinent part: "At the present time, eToys is far and away the industry leader. This is due to its early positioning that would have been identical to Kids' Universe. . . . [¶] eToys recently filed for an Initial Public Offering (IPO) expected to draw $115 million [citation]. This implies that the market predicts long term annual profit in the $15 million per year range. This is a

reasonable forecast for a firm with annual revenue currently at just under $30 million that is expected to double or triple every year for the next three to five years [citation]. [¶] Assuming that eToys and Kids' Universe would have been roughly equal competitors, the capital value of Kids' Universe could have been in excess of $50 million. This is therefore an estimate of the present value of lost profits to Kids' Universe from the possibility that the market will have grown sufficiently to foreclose effective market presentation." Dr. Hanson concluded if no settlement was reached between the parties to this action "by the time Toys 'R' Us or Mattel makes the expected entry into [e-]commerce," Kids' Universe's loss would probably be valued at $50 million. Dr. Hanson cautioned: "This latter estimate is preliminary, however. If the market continues to astound, market valuations may argue for even larger damages in the near future." Dr. Hanson relied on news articles as the source of his information about eToys.

Two years after the flood, plaintiffs brought this action against defendants to recover profits lost *not* from the operation of the retail store, but because of the inability to launch the Web site at an optimal time. Plaintiffs alleged one cause of action for negligence. Defendants moved for summary judgment on the ground plaintiffs could not establish the damage element. The trial court granted the motion. The court concluded in part as follows: "In opposition to the motion for summary judgment, plaintiffs submitted, inter alia, the declaration of a forensic economist who projected a healthy profit for the venture planned here. Such expert opinion, however, may not itself be based upon speculation, conjecture, or unsupported theory. As a result, the expert's declaration, and supporting documentation, does not raise a triable issue of material fact. . . . [P]laintiffs' anticipated profits were merely a hope or expectation of profits supported by no proof capable of reasonable certainty. The same is true for [their] claim that the passage of time and the rapid development of e-commerce on the [W]eb made it impossible for plaintiffs to go forward with their venture in 1998, following the refurbishing of their retail store. Plaintiffs maintain that but for defendants' negligence they would have possessed the financial resources to establish a unique and profitable [Web site] in November 1997, that could not be recreated a[t] any point in the future. Once again, the damages they seek are too uncertain, speculative, or remote. Simply put, there is no triable issue of fact as to damages."

## III. DISCUSSION

### A. *Summary Judgment Law and the Standard of Review*

■ We apply the parties' summary judgment burdens of production described by the Supreme Court in *Aguilar v. Atlantic Richfield Co.* (2001)

25 Cal.4th 826, 850-851 [107 Cal.Rptr.2d 841, 24 P.3d 493], "From commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. [Citation.] There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the *applicable standard of proof.* . . . [¶] [T]he party moving for summary judgment bears an *initial burden of production to make a prima facie showing* of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (Italics added, fn. omitted; accord, *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 468-469 [110 Cal.Rptr.2d 627].)

We review the trial court's decision to grant summary judgment de novo. (*Johnson v. City of Loma Linda, supra,* 24 Cal.4th at pp. 65, 67-68; *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1188 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on another point in *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 853, fn. 19.) As to conducting de novo review, the Supreme Court described our duty as follows, "In ruling on the motion the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom ([Code Civ. Proc.,] § 437c, subd. (c)), and must view such evidence [citations] and such inferences [citations] in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843.) The trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale. (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356]; *Barnett v. Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219].)

An additional thought is in order concerning the burden of production language in *Aguilar.* In describing the summary judgment burden of production, the Supreme Court held, "[I]f a defendant moves for summary judgment against such a plaintiff, he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law,* but would have to present *his* evidence to a trier of fact." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 851, original italics,

fn. omitted.) The import of the "more likely than not" language in the foregoing quotation is that a moving defendant must present evidence which, if uncontradicted, would constitute a preponderance of evidence that an essential element of the plaintiff's case cannot be established. (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205 [52 Cal.Rptr.2d 518] ["In a civil case the party with the burden of proof must convince the trier of fact that its version of a fact is more likely than not the true version. Stated another way, it requires the burdened party 'to convince the trier of fact that the existence of a particular fact is more probable than its nonexistence—a degree of proof usually described as proof by a preponderance of the evidence.' (Cal. Law Revision Com. com., 29B pt. 1 West's Ann. Evid. Code (1995) § 500, p. 553.)"]; accord, *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 776 [107 Cal.Rptr.2d 617, 23 P.3d 1143] [tort causation element requires that a "plaintiff must show it more likely than not defendant's conduct was cause in fact of the result; 'mere possibility of such causation is not enough' "]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 [100 Cal.Rptr.2d 352, 8 P.3d 1089] [in discrimination suit, the plaintiff must at least show " ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion' " ' "]; *Barber v. Rancho Mortgage & Investment Corp.* (1994) 26 Cal.App.4th 1819, 1834 [32 Cal.Rptr.2d 906] [preponderance of evidence burden in discrimination suit requires an initial showing that discriminatory factors " ' "more likely than not" ' " led to challenged conduct].) The same is true when a moving defendant seeks to secure dismissal of the complaint based on an affirmative defense. (Code Civ. Proc., § 437c, subd. (n)(2).)

At one point in *Aguilar*, the Supreme Court noted: "Aguilar also claims that the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact. We agree here as well. The court may not 'grant[]' the defendants' motion for summary judgment 'based on inferences . . . , if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.' (Code Civ. Proc., § 437c, subd. (c).) Neither, apparently, may the court grant their motion based on any evidence from which such inferences are drawn, if so contradicted. That means that, if the court concludes that the plaintiff's evidence or inferences raise a triable issue of material fact, it must conclude its consideration and deny the defendants' motion. [¶] But, even though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact*. Aguilar effectively admits as much. In so doing, it does not

decide on any finding of its own, but simply decides what finding such a trier of fact could make for itself. (Cf. *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1580-1581 [47 Cal.Rptr.2d 752] [motion for nonsuit]; *Salter v. Keller* (1964) 224 Cal.App.2d 126, 128 [36 Cal.Rptr. 430] [same].)" (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 856.) Therefore, if a plaintiff in response to a defendant's summary judgment request demonstrates the existence of a triable dispute with "specific facts" (§ 437c, subd. (*o*)(2)) by making a prima facie showing of the merit of the complaint, the motion must be denied. There is to be no weighing of evidence. (*Ibid.; Kolodge v. Boyd* (2001) 88 Cal.App.4th 349, 375-376 [105 Cal.Rptr.2d 749]; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 837 [52 Cal.Rptr.2d 831].)

Nonetheless, at another place in *Aguilar*, there is language some may argue would permit summary judgment to be granted in the face of equally probative evidence on each side. While discussing the summary judgment burden in an antitrust action for unlawful conspiracy, the Supreme Court held: "[I]f the court determines that any evidence or inference presented or drawn by the plaintiff indeed shows or implies unlawful conspiracy *more likely than* permissible competition, it must then deny the defendants' motion for summary judgment, even in the face of contradictory evidence or inference presented or drawn by the defendants, because a reasonable trier of fact could find for the plaintiff. Under such circumstances, the unlawful-conspiracy issue is triable—that is, it must be submitted to a trier of fact for determination in favor of either the plaintiff or the defendants, and may not be taken from the trier of fact and resolved by the court itself in the defendants' favor and against the plaintiff. [¶] But if the court determines that all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply unlawful conspiracy *only as likely as* permissible competition *or even less likely*, it must then grant the defendants' motion for summary judgment, even apart from any evidence presented by the defendants or any inferences drawn therefrom, because a reasonable trier of fact could not find for the plaintiff. Under such circumstances, the unlawful-conspiracy issue is not triable—that is, it may not be submitted to a trier of fact for determination in favor of either the plaintiff or the defendants, but must be taken from the trier of fact and resolved by the court itself in the defendants' favor and against the plaintiff." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 856-857, fn. omitted.) The footnote omitted from the immediately preceding quotation from *Aguilar* discusses equally likely possibilities of a corrupt antitrust conspiracy and lawful competition. It states: "Accord, 2 Areeda and Hovenkamp, Antitrust Law [(rev. ed. 1995)] paragraph 322, page 70 (stating that, 'when the evidence is in equipoise on a matter that a party must establish by a

preponderance of the evidence, summary judgment will be granted against that party'); 6 Areeda, Antitrust Law, *supra*, paragraph 1423d, page 139 (implying that, when a reasonable trier of fact 'cannot say whether' a 'conspiratorial or non-conspiratorial explanation is more probable,' 'summary judgment . . . would have to be given against the party bearing the burden of persuasion' by a preponderance of the evidence)." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 857, fn. 27.)

This language can be read to infer that, at the summary judgment stage, if there are equally conflicting inferences to be drawn from the evidence, the moving defendant is entitled to the benefit of that conflict and the motion must be granted. If so, this language would conflict with that recited elsewhere in *Aguilar* where the Supreme Court held that if there is a conflict in the inferences such that a triable issue exists, the summary judgment motion must be denied. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 856.) Typically, in summary judgment litigation, equally conflicting evidence requires a trial to resolve the dispute. (See *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 724 [110 Cal.Rptr.2d 528, 28 P.3d 249]; *Livingston v. Marie Callenders, Inc.* (1999) 72 Cal.App.4th 830, 839 [85 Cal.Rptr.2d 528].) The language in *Aguilar* cited in the immediately preceding paragraph concerning illegal conspiracy versus legal competition does not retreat from this black letter statement of California law that equally conflicting evidence typically requires the denial of a summary judgment motion. As can be noted, the Supreme Court was discussing a limited rule concerning evidence in "equipoise" on the issue of permissible competition versus an unlawful conspiracy in the antitrust context. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 857, fn. 27.) ▉ Under both state and federal antitrust law, ambiguous evidence or inferences showing conduct that is equally consistent with permissible competition as it is with illegal conspiracy is insufficient to meet a plaintiff's burden on summary judgment or at trial; such evidence would not allow a trier of fact to find an unlawful conspiracy more likely than not. (*Id.* at pp. 846-847, 851-852.) This rule, applicable in antitrust actions for unlawful conspiracy, arises from a concern that if ambiguous evidence or inferences were sufficient, antitrust law "might effectively chill procompetitive conduct in the world at large, the very thing that it is designed to protect [citation], by subjecting it to undue costs in the judicial sphere." (*Id.* at p. 852; see also *id.* at p. 846.) The entire "equipoise" analysis in *Aguilar* appears in paragraphs discussing the antitrust burdens of production. (*Ibid.*) The Supreme Court was not analyzing the general scope of the summary judgment statute as it had earlier in the *Aguilar* opinion. (*Id.* at pp. 843-856.) The cited language concerning antitrust conspiracy evidence in equipoise does not hold that if inferences are in conflict in other contexts, summary judgment is now

appropriate given the 1992 and 1993 amendments to section 437c. (*Id.* at pp. 847-848.) There is no evidence the Legislature intended such a dramatic change in the summary judgment law. (*Id.* at pp. 848-849 & fns. 7-10; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 581-592 [37 Cal.Rptr.2d 653].) ■ If the evidence in tort cases such as this one is equally in conflict as to a material fact, summary judgment is not in order.

## B. *Defendants' Obligation to Present Evidence*

As noted above, the Supreme Court has held that a defendant moving for summary judgment has the initial burden of production of evidence. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 854-855 & fn. 23; *FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 73-75 [41 Cal.Rptr.2d 404].) ■ In the present case, plaintiffs contend defendants were not entitled to summary judgment because they did not meet their burden as the moving parties. Plaintiffs assert defendants offered no affirmative evidence to show that plaintiffs could not establish the damage element of their negligence claim. We disagree.

Defendants presented affirmative evidence plaintiffs had been paid $200,000 by an insurer "for damage to property maintained at [the Kids' Universe] retail store, including furniture, computer hardware and inventory allegedly ruined by the water." In addition, defendants presented evidence, in the form of plaintiffs' responses to interrogatories, that at the time of the flood, Kids' Universe employed, in addition to the two owners, a sales employee, two instructors, a store manager, and a fifth staffer whose function was unidentified; the total amount of revenue obtained from sales through the Kids' Universe Web site each year from 1995 to 2000 was less than $500 per year with the exception of one order for approximately $17,000; Kids' Universe had no line of credit available to it in 1997 and 1998; and there were no commitments to invest in Kids' Universe from 1995 to 2000. The foregoing was affirmative evidence presented by defendants in support of their summary judgment motion to show plaintiffs would be unable to establish the only damage element of their negligence cause of action, i.e., lost profits. The foregoing would require a reasonable trier of fact to find it more likely there were no lost profits than to conclude that there were such losses. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 851; *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 115-116 [113 Cal.Rptr.2d 90].) The burden therefore shifted to plaintiffs to present evidence raising a triable issue of fact as to their ability to show damage.

## C. *Lost Profits*

■ The Supreme Court set forth the law concerning lost profits as damages in *Grupe v. Glick* (1945) 26 Cal.2d 680, 692-693 [160 P.2d 832], as

follows: "[W]here the operation of an *established business* is prevented or interrupted, as by a tort or breach of contract or warranty, damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales. [Citations.] On the other hand, where the operation of an *unestablished business* is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability. [Citations.] All of these [cited] cases recognize and apply the general principle that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent." (Italics added; accord, e.g., *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 889-890 [93 Cal.Rptr.2d 364]; *Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1697-1698 [42 Cal.Rptr.2d 136]; *Maggio, Inc. v. United Farm Workers* (1991) 227 Cal.App.3d 847, 869-870 [278 Cal.Rptr. 250]; *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 221 [92 Cal.Rptr. 111].) In *Natural Soda Prod. Co. v. City of L. A.* (1943) 23 Cal.2d 193, 199 [143 P.2d 12], the Supreme Court held: "The award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort. If no such basis exists, as in cases where the establishment of a business is prevented, it may be necessary to deny such recovery. [Citations.] If, however, there has been operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of prospective profits are awarded. [Citations.]" Contrary to plaintiffs' assertion, the rule regarding proof of lost profits from an unestablished business applies in tort as well as contract cases. (*Grupe v. Glick, supra,* 26 Cal.2d at pp. 692-693; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989-990 [105 Cal.Rptr.2d 88].) Uncertainty as to the *amount* of profits is not fatal to such a claim. (*Continental Car-Na-Var Corp. v. Moseley* (1944) 24 Cal.2d 104, 113 [148 P.2d 9]; *Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 161 [190 Cal.Rptr. 815]; *Fisher v. Hampton* (1975) 44 Cal.App.3d 741, 748 [118 Cal.Rptr. 811]; *Engle v. City of Oroville* (1965) 238 Cal.App.2d 266, 272-273 [47 Cal.Rptr. 630].) As the Court of Appeal explained in *S.C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536 [30 Cal.Rptr.2d 286], "Lost anticipated profits cannot be recovered if it is uncertain whether

any profit would have been derived at all from the proposed undertaking. But lost prospective net profits may be recovered if the evidence shows, with reasonable certainty, both their occurrence and extent. [Citation.] It is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct. [Citations.]" Moreover, the court held, a plaintiff is "not required to establish the amount of its damages with absolute precision, and [is] only obliged to demonstrate its loss with reasonable certainty. [Citation.]" (*Id.* at pp. 537-538; accord, *Natural Soda Prod. Co. v. City of L. A., supra,* 23 Cal.2d at p. 200 ["Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated."]; *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 908 [215 Cal.Rptr. 679, 701 P.2d 826]; Rest.2d Torts, § 912, com. a, p. 479.) The Restatement Second of Torts provides in this regard: "It is desirable . . . that there be definiteness of proof of the amount of damage as far as is reasonably possible. It is even more desirable . . . that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered. Particularly is this true in situations . . . where the harm is of such a nature as necessarily to prevent anything approximating accuracy of proof, as when anticipated profits of a business have been prevented." (Rest.2d Torts, § 912, com. a, p. 479.)

The Court of Appeal has defined lost profits as follows: " 'Net profits are the gains made from sales "after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed." [Citation.]' " (*Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists, supra,* 14 Cal.App.3d at pp. 222-223; accord, *Resort Video, Ltd. v. Laser Video, Inc., supra,* 35 Cal.App.4th at p. 1700.) A plaintiff must show loss of net pecuniary gain, not just loss of gross revenue. (*Resort Video, Ltd. v. Laser Video, Inc., supra,* 35 Cal.App.4th at p. 1700; *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists, supra,* 14 Cal.App.3d at pp. 222-223.)

When the operation of an unestablished business is prevented, as here, prospective profits may be shown in various ways. The Restatement Second of Contracts, section 352, comment b, at page 146 provides, "[I]f the business is a new one or if it is a speculative one . . . , damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." Similarly, the Restatement Second of Torts, section 912, comment d at page 483 states, "When the tortfeasor has prevented the beginning of a new business . . . all factors relevant to the likelihood of the success or lack of success of the business or transaction that are reasonably provable are to be considered, including general business conditions and the degree of success of similar enterprises."

Our Courts of Appeal have held, consistent with the Restatement Second of Torts, that the experience of similar businesses is one way to prove prospective profits. (*Resort Video, Ltd. v. Laser Video, Inc., supra,* 35 Cal.App.4th at p. 1699 [plaintiff did not introduce any evidence of "operating histories of comparable businesses"]; *Berge v. International Harvester Co., supra,* 142 Cal.App.3d at p. 163 [a plaintiff can rely on "data from other enterprises" operating under "similar conditions"]; *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists, supra,* 14 Cal.App.3d at p. 222 [plaintiff did not introduce evidence of "operating history of comparable businesses in the locality"]; see generally Annot., Recovery of Anticipated Lost Profits of New Business: Post-1965 Cases (1987) 55 A.L.R.4th 507.) Also relevant is whether the market is an established one. (*Resort Video, Ltd. v. Laser Video, Inc., supra,* 35 Cal.App.4th at pp. 1697-1698.) In *S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp.* (1976) 58 Cal.App.3d 173, 184-185 [130 Cal.Rptr. 41], for example, the Court of Appeal held the evidence supported lost profits awarded in favor of a parking garage operator. In that case, a developer failed to construct a parking garage as agreed. The Court of Appeal relied on the following: although the particular garage was a new venture, the parking business was an established business; the parking garage operator was highly experienced as such; running a parking garage was a relatively simple operation; an experienced land economist concluded, based on feasibility studies and the evidence developed at the trial, that the garage would have been a very profitable operation; and a longtime employee of the plaintiff testified to the profitability of a similar garage already operated by the company. (*Ibid.*)

Cases from other jurisdictions also offer some examples of the types of evidence that suffice or are not sufficient to prove prospective lost profits from the operation of an unlaunched or new venture. In *Kaech v. Lewis County PUD* (2001) 106 Wash.App. 260 [23 P.3d 529, 539], the Court of Appeals of Washington upheld a lost profits finding where a dairy farm had been in operation for only a short time. The court of appeals held: " '[E]xpert testimony alone is a sufficient basis for an award of lost profits in the new business context when the expert opinion is supported by tangible evidence with a "substantial and sufficient factual basis" rather than by mere "speculation and hypothetical situations." ' [Citations.]" In *Kaech,* a "liability expert" based his calculation of lost profits due to a cow herds' reduced milk production on a variety of factors including a rolling herd average, actual milk the herd had produced, and dairy herd improvement records as compared to the state average trend. (*Ibid.*)

In *Beverly Hills Concepts v. Schatz & Schatz* (1998) 247 Conn. 48 [717 A.2d 724, 735-737], the Supreme Court of Connecticut reversed a lost

profits damage award in favor of an unestablished business where a certified public accountant based his projections on speculative assumptions and unreasonable comparisons. The Connecticut Supreme Court noted: "This court and courts of other jurisdictions have looked to a number of factors in evaluating whether the plaintiff has proved lost profits to a reasonable certainty. A plaintiff's prior experience in the same business has been held to be probative [citations]; as has a plaintiff's experience in the same enterprise subsequent to the interference. [Citations.] In jurisdictions that have been faced with assessing damages for the destruction of a new business, the experience of the plaintiff and that of third parties in a similar business have been admitted to prove lost profits. [Citations.] In addition, the average experience of participants in the same line of business as the injured party has been approved as a method of proving lost profits. [Citations.] Similarly, prelitigation projections, particularly when prepared by the defendant, have also been approved. [Citation.] The underlying requirement for each of these types of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed." (*Id.* at pp. 737-738.) In *Beverly Hills Concepts,* the certified public accountant who testified on the plaintiff's behalf had no experience in the industry in question, and "based his projections on informal interviews and articles in the lay press about the industry." (*Id.* at p. 738.) The Connecticut Supreme Court found the evidence insufficient to support the jury's damage award.

*Given v. Field* (1997) 199 W.Va. 394 [484 S.E.2d 647, 649] involved the breach of an agreement to manufacture and sell the plaintiff's invention, a "back saver," and to pay the plaintiff a royalty on each sale. The Supreme Court of Appeals of West Virginia held there was sufficient evidence to support the jury's award of lost profit damages. (*Id.* at p. 651.) The plaintiff introduced a scientific market study indicating that, if reasonably marketed and sold, plaintiff's product would have captured a certain percent of annual sales of back saver devices; financial data from a seller of the plaintiff's device showing that for a brief period of time it had purchased a certain number of the plaintiff's product from the manufacturer defendant; and the testimony of a certified public accountant who, using conservative numbers, calculated the value of the contract. (*Ibid.*)

We turn to the case before us. We view the evidence in the light most favorable to plaintiffs. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843; *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1269 [32 Cal.Rptr.2d 223, 876 P.2d 1022].) The evidence and inferences reasonably drawn therefrom show the following. Given Kids' Universe's state-of-the-art Web site, and its expected favorable one-click Web portal

placement on the fast-growing MindSpring site, and perhaps the "high[ly] trafficked" WeatherChannel Web site as well, it would have attracted a very high number of relatively wealthy potential customers to its on-line store. Kids' Universe was prepared to meet customers' on-line orders through drop-shipment agreements with manufacturers as well as direct shipments from its Beverly Hills retail store. Once the Rudzkis proved they could significantly attract customers and had a viable on-line business, the Kids' Universe Web site would have attracted significant venture capital, i.e., "[f]unds invested in a new enterprise that has high risk and the potential for a high return." (Black's Law Dict. (7th ed. 1999) p. 200.) Further, given the timing of the venture, both in terms of the approaching holidays, and the emerging Internet business, coupled with the availability of Web portal placement without any up-front fees, Kids' Universe would have been in a position to be a financially successful leader in the e-commerce sale of toys. Finally, based on a comparison with eToys's status in 1999 and assuming Kids' Universe and eToys would have been roughly equal competitors, Kids' Universe's capital value—money or assets invested, or available for investment, in the business (Black's Law Dict., *supra*, p. 200—could have been in excess of $50 million.

As substantial as plaintiffs' evidence sounds on the surface, we conclude it does not suffice to raise a triable issue as to lost *profits*. The evidence would not allow a reasonable trier of fact to find with reasonable certainty lost net *profits* from the unlaunched Web site by a preponderance of the evidence. (*Lugtu v. California Highway Patrol, supra,* 26 Cal.4th at p. 722; *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.) This is because the evidence, while *suggesting* the Web site would have been viable, is not of a type necessary to demonstrate that a triable controversy exists as *to a reasonable certainty* that the unestablished business would have made a *profit.* Although plaintiffs had five years' experience as toy retailers, and had operated a Web site since 1995, they had not previously operated their Web site as a *profit*-producing venture. Plaintiffs' operation of the Kids' Universe Web site had in the past resulted in negligible revenues and therefore would not support an inference there were lost prospective *profits.* In addition, the on-line market for toys was not an established one. Further, the whole scenario presented by plaintiffs is rife with speculation. The following undisputed contingencies existed so as to bar the computation of potential lost *profits*: Kids' Universe would be competing with two other toy retailers on the MindSpring portal; it would be necessary for Kids' Universe to attract not only sufficient viewers from the MindSpring portal but customers who actually made purchases; the amount of purchases would have to be of sufficient quantity to make the site financially viable; venture capital in an unknown amount might have been available; and plaintiffs might have

produced *profits* in some amount. Moreover, plaintiffs presented no evidence to the effect it was reasonably probable the venture would have been profitable, i.e., gains from on-line sales would have exceeded the costs of operating the Web site business. Plaintiffs presented no evidence of a satisfactory basis for estimating what the probable earnings would have been. They failed to assert any method for determining lost *profits*. Plaintiffs presented no specific economic or financial data, market survey, or analysis based on the business records or operating histories of similar enterprises. That the eToys venture was successful up to 1999, as set forth in Dr. Hanson's declaration, does not suffice in and of itself to raise a triable issue as to plaintiffs' lost *profits*. Dr. Hanson's comments about eToys's success were based on news articles and not on any actual data. Dr. Hanson's conclusion that plaintiffs' on-line business would have resulted in *profits* was based on an unanalyzed *assumption* the Kids' Universe Web site would have been a roughly equal competitor with eToys. Further, Dr. Hanson's conclusion plaintiffs lost *profits* is based on his unexplained projected capital value of Kids' Universe without any analysis of its net worth. In short, Dr. Hanson's comparison of the proposed Web site with eToys's success does not suffice to raise a triable issue of material facts whether Kids' Universe would have realized net *profits* from the operation of its on-line business. Therefore, the trial court properly entered summary judgment in favor of the defendants.

## IV. DISPOSITON

The summary judgment is affirmed. Defendants, In2Labs and Conrad Salindong, are to recover their costs on appeal, jointly and severally, from plaintiffs, Kids' Universe, Lew Rudzki, and Howard Rudzki.

Armstrong, J., concurred.

**MOSK, J.**—I concur in the result. Unlike the majority, I do not discern any ambiguity or inconsistency in the discussion of summary judgment in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*). One cannot infer from *Aguilar*, as the majority asserts, "that, at the summary judgment stage, if there are equally conflicting inferences to be drawn from the evidence, the moving defendant is entitled to the benefit of that conflict and the motion must be granted." (Maj. opn., *ante*, at p. 881.) The majority opinion appears to confuse *Aguilar*'s discussion of the plaintiff's burden of production in opposing summary judgment with *Aguilar*'s standard for granting summary judgment.

In *Aguilar*, the Supreme Court said that "[i]f a party moving for summary judgment in any action, including an antitrust action for unlawful conspiracy, would prevail at trial without submission of any issue of material

fact to a trier of fact for determination, then he should prevail on summary judgment." (*Aguilar, supra,* 25 Cal.4th at p. 855.) To establish his entitlement to summary judgment, "if a defendant moves for summary judgment . . . , he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law,* but would have to present *his* evidence to a trier of fact." (*Id.* at p. 851.)

When the defendant has presented such evidence, the burden shifts to the plaintiff "to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar, supra,* 25 Cal.4th at p. 850.) The extent of this burden depends on the burden that the party would bear at trial. (*Id.* at p. 851.) In *Aguilar,* the plaintiff would have borne the burden of proof by the preponderance of the evidence on her causes of action at trial. (*Id.* at pp. 861, 866.) Therefore, to prevent the entry of summary judgment against her, she would have had to "present evidence that would [have] allow[ed] a reasonable jury to find [an antitrust] conspiracy more likely than not." (*Id.* at p. 862.)

When the standard of proof is a preponderance of the evidence—as it is here—the plaintiff's burden cannot be met by the production of evidence that merely demonstrates that the matter sought to be established is as likely as it is unlikely. The Supreme Court quoted that " 'when the evidence is in equipoise on a matter that a party must establish by a preponderance of the evidence, summary judgment will be granted against that party.' " (*Aguilar, supra,* 25 Cal.4th at p. 857, fn. 27.) For example, if the court concludes that notwithstanding that the evidence and inferences therefrom may be in "equipoise," a reasonable fact finder could not conclude that a plaintiff has established its case by a preponderance of the evidence, then summary judgment will be granted against the plaintiff. Contrary to the majority's intimation, this proposition is not an assertion that equally conflicting evidence entitles defendant to summary judgment. It is merely a statement that a plaintiff, to defeat a motion for summary judgment, needs to meet its burden to make a prima facie showing of a triable issue of fact by submitting evidence from which a reasonable fact finder could decide in favor of that plaintiff. As the Supreme Court stated, "But if the court determines that all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply unlawful conspiracy *only as likely as* permissible competition *or even less likely,* it must then grant the defendants' motion for summary judgment, even apart from any evidence presented by the defendants or any inferences drawn therefrom, because a reasonable trier of fact could not find for the plaintiff." (*Id.* at p. 857.)

This position does not suggest that in connection with a summary judgment motion the court weighs the evidence or inferences as a trier of fact.

(*Aguilar, supra,* 25 Cal.4th at p. 856.) As the Supreme Court also quoted, " '[A]ssessing the sufficiency of the evidence to determine whether a reasonable juror could find that the plaintiff has satisfied his burden of persuasion is a traditional judicial function.' " (*Id.* at p. 856, fn. 26.) In *Aguilar,* as in many antitrust cases, the evidence consisted of undisputed economic facts with conflicting inferences, thereby facilitating such an assessment by the court. (*Id.* at pp. 839, 862-866.) Because the evidence submitted by the plaintiff was insufficient to satisfy her burden of production, summary judgment was proper. (*Id.* at p. 862 ["Aguilar did not carry the burden of production shifted onto her shoulders to make a prima facie showing of the presence of an unlawful conspiracy"].) The Supreme Court emphasized that a summary judgment cannot be granted on the basis of a weighing of evidence or resolution of conflicting, material facts. (*Id.* at p. 856.) Thus, for example, if the credibility of witnesses was determinative, summary judgment would be inappropriate.

*Aguilar* clearly points out that in any type of case—not just an antitrust case—if the evidence before the court and inferences therefrom, whether conflicting or not, show that a reasonable fact finder cannot conclude that a party should prevail, then summary judgment is appropriate against that party. (*Aguilar, supra,* 25 Cal.4th at pp. 855, 857.)