[No. G036525. Fourth Dist., Div. Three. June 19, 2007.]

PARLOUR ENTERPRISES, INC., et al., Plaintiffs and Respondents, v. THE KIRIN GROUP, INC., et al., Defendants and Appellants.

## COUNSEL

Law Offices of William B. Hanley, William B. Hanley; and Gerald N. Shelley for Defendants and Appellants.

Smith, Chapman & Campbell, Steven C. Smith, William D. Chapman and Robert J. Hadlock for Plaintiffs and Respondents.

## OPINION

**RYLAARSDAM, J.**—A jury awarded plaintiffs Parlour Enterprises, Inc. (Parlour), Fun Foods 1, LP (Fun Foods 1), and Fun Foods Block, LP (Fun Foods Block), approximately $6.6 million in damages. The award consisted of lost profits, lost franchise fees, and consequential expenses sustained by

plaintiffs when defendants unilaterally terminated a franchise agreement to develop subfranchises. Defendants Herman Chan and his corporation, The Kirin Group, Inc. (Kirin), appeal, contending the damages awarded were improper because the evidence was unreliable. We agree, with the exception of $62,907 awardable to Parlour as lost franchise fees and $67,348 in extra expenses incurred by Parlour to develop the subfranchises. We also reverse the judgment in favor of Fun Foods 1 and Fun Foods Block on the cause of action for intentional interference with prospective economic advantage. The matter is remanded to the trial court with directions to reduce the award of damages to Parlour to $130,255. In all other respects, the judgment is affirmed.

## FACTS AND PROCEDURAL BACKGROUND

From 1963 to 1972, Bob Farrell opened 55 Farrell's Ice Cream Parlours (Farrell's) around the United States. In 1972, he sold all of them to Marriott Corporation, which opened an additional 85 restaurants. Around 1980, Marriott sold the ice cream parlors, only to take them back three years later. Marriott shut down all Farrell's operations in the mid-1980's, except for a single Farrell's operating in San Diego.

Chan, who had worked at a Farrell's as a teenager, formed Kirin and in 1996 bought the Farrell's trademarks and trade names. In November 1999 he opened a Farrell's in Temecula but closed it in early 2002 because it was not profitable.

Before closing that Farrell's, Kirin entered into a series of written agreements with Parlour in 2000 to develop Farrell's subfranchises in California. The agreements consisted of an area development agreement (ADA) and a rider to the ADA. The ADA gave Parlour the exclusive right to subfranchise Farrell's in California, subject to Kirin's written consent and except for Kirin's "reserv[ing] to itself the right . . . to: . . . itself, or through an Affiliate, own and operate 'Farrell's Ice Cream Parlour Restaurants' which are located a minimum of two and a half (2 1/2) miles in any direction from an existing Restaurant or a Restaurant then under construction in accordance with a Franchise Agreement or an approved Subfranchise Agreement[] . . . ." Under the subfranchise agreements, Parlour was to receive an upfront fee and royalties in the form of a percentage of the net sales.

The ADA required Parlour to open a minimum number of restaurants within a certain time period. Parlour ultimately opened only one store within the required time; a Farrell's in Santa Clarita, which opened in 2001. The limited partnership that owns the center provided the funds. Before then Parlour had been unable to find any investors.

Parlour was also unsuccessful in obtaining investors for additional restaurants. Accordingly, Parlour set up the limited partnerships of Fun Foods Block and Fun Foods 1 to fund the building of Farrell's at The Block in Orange and in Aliso Viejo, respectively. For both partnerships, the limited partners contributed 100 percent of the funds.

In December 2002, Kirin and Parlour executed a settlement and mutual release agreement, which extended Parlour's time to open the second restaurant to December 2003 and gave it an additional year to open the other restaurants. The parties thereafter signed an amendment to the settlement agreement. Kirin terminated the ADA in October 2003 for Parlour's refusal to pay over $19,000 in attorney fees relating to the amendment.

Parlour, Fun Foods 1, and Fun Foods Block sued defendants. Parlour alleged causes of action for breach of contract, intentional fraud, negligent misrepresentation, and defamation. Fun Foods 1 and Fun Foods Block brought a claim for interference with prospective business advantage.

At trial plaintiffs' expert, Robert Wunderlich, testified to the amount of damages caused by defendants' conduct, referencing eight locations in his analysis. Three of them, The Block, Aliso Viejo, and Fresno, had specific plans for opening a restaurant. For these he calculated franchise fees and lost profits owed to Parlour. For the one location already open, Santa Clarita, and the remaining four locations, Wunderlich assessed only franchise fees owed to Parlour. The fees included a $35,000 upfront charge, plus royalties in the form of a percentage of the gross sales.

Projections provided by Parlour formed the starting point of Wunderlich's analysis for both the franchise fees and lost profits. Wunderlich did not know who created the projections or his or her education, training, or experience. But he knew the projections were prepared on behalf of Parlour's principals, who were "experienced in these sorts of businesses." If Parlour had not provided the projections, Wunderlich would have had to develop them himself.

He also used these projections to determine expenses and "bench marked that by looking at actual expenses [and analyzing the financials of] the Santa Clarita location and in general for the industry." He did not use Parlour's projections for the first two years but rather allowed for a ramp up time. As Wunderlich explained, "So the first two years have lower sales than actually [were] contained in this projection. And then beyond . . . year 3, that's when I reached the stabilized period" and used Parlour's projections.

In addition, Wunderlich "obtained market data[] . . . about a couple of dozen ice cream parlors." He looked at the publicly available information for

one chain of restaurants called Friendly's, a publicly traded company. According to Wunderlich, Friendly's "is a chain of about 300 or so restaurants, which is similar to Farrell's in that it has both the ice cream end and the food end." The earnings projected by Parlour were lower than the Friendly's chain, which indicated to him that Parlour's projections were reasonable. He also considered "some projections from ice cream stores," but relied more on the data for Friendly's because it "had both the ice cream component and the food component, where the others were purely ice cream [parlors], smaller operations than ones which would be serving a full menu."

He further considered the two Farrell's that were open, Santa Clarita and San Diego. To determine San Diego's revenues, expenses, and profits, Wunderlich spoke only to Parlour's principals. For Santa Clarita, the profit and loss statement covered the entire center, precluding Wunderlich from determining the restaurant's profit and loss from its operations alone. But he was able to "do a rough appraisal" of the net profits by allocating or apportioning expenses. He looked at line items, tagged some of the expenses as food oriented or game oriented, and allocated the rest according to revenue. He determined "that the [Santa Clarita] restaurant was generating a positive profit when [he] did a reasonable allocation of the operating expenses to the restaurant."

The sales from Santa Clarita were lower than plaintiffs' projections, which he concluded was because it did not receive stand-alone business but rather "most of its business tended to be from people already there at the arcade, as opposed to itself being a big attraction. [¶] And so in [plaintiffs'] view, the [Santa Clarita] location was not as attractive of a location as the other[s] for which they had plans." For that reason, he did not use the actual Santa Clarita numbers as a starting point for his other estimates.

Wunderlich started with revenues and deducted expenses, such as labor, rent, insurance, and other items of overhead to arrive at net profit. He divided the amount of damages suffered by plaintiffs into three categories: loss of franchise fees (a one-time charge plus a percentage of revenue), lost profits, and extra expenses incurred in implementing the ADA. He calculated that Parlour's lost franchise fees would be about $2.6 million, lost profits for The Block, Aliso Viejo, and Fresno would be about $3.9 million ($1.5 million for The Block, $785,000 for Aliso Viejo, and $1.7 million for Fresno), and the extra expenses incurred collectively by plaintiffs would be $202,929, for a total of about $6.7 million.

As to the lost franchise fees, Wunderlich took a percentage of the gross revenue, and adding a "one-time flat fee," discounted it to present value. According to Wunderlich, "franchise fees are based only on a percentage of

revenue[ s]o you don't have to consider expenses. You don't even have to consider profitability[. A]s long as the stores are open and earning revenue," Parlour would receive franchise fees.

For the $202,929 in extra expenses, Wunderlich separated the expenses between Parlour, Fun Foods Block, and Fun Foods 1. Using Parlour's bank account records, he added up the expenses that would be wasted if it could not develop the locations, which totaled $67,348. He did the same thing with Fun Foods Block and Fun Foods 1 and determined their extra expenses were $126,486 and $9,095, respectively.

A jury found in plaintiffs' favor on all causes of action except defamation. It awarded Parlour $4.25 million, Fun Foods 1 $785,000 and Fun Foods Block $1.6 million. The trial court denied defendants' motions for judgment notwithstanding the verdict and for new trial.

After oral argument, plaintiffs filed a supplemental letter brief on issues raised by the court. We ordered the letter brief filed and allowed defendants an opportunity to respond. Plaintiffs moved to strike portions of defendants' reply letter brief and subsequently applied to file a reply to defendants' opposition. The motion to strike is denied. The application to file a reply to defendants' opposition is granted.

## DISCUSSION

Defendants contend the evidence was insufficient to support the damage award because the expert opinion on which it was based was "so speculative that the trial court should have excluded the opinion and . . . the opinion cannot constitute substantial evidence to support the verdict." We agree in part.

### 1. General Legal Principles

■ "Damage awards in injury to business cases are based on net profits. [Citation.]" (*Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1180 [36 Cal.Rptr.3d 663].) " ' "Net profits are the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.' [Citation.]" ' [Citations.] A plaintiff must show loss of net pecuniary gain, not just loss of gross revenue. [Citations.]" (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 884 [116 Cal.Rptr.2d 158] (*Kids' Universe*).)

■ Where an established business's operation is prevented or interrupted, " 'damages for the loss of prospective profits that otherwise might have been

made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales. [Citations.]' " (*Kids' Universe, supra,* 95 Cal.App.4th at p. 883, citing *Grupe v. Glick* (1945) 26 Cal.2d 680, 692–693 [160 P.2d 832].) On the other hand, lost anticipated profits for an unestablished business whose operation is prevented or interrupted are generally not recoverable because their occurrence is uncertain, contingent and speculative. Nevertheless, they may be recovered " 'where the evidence makes reasonably certain their occurrence and extent.' [Citations.]" (*Kids' Universe, supra,* 95 Cal.App.4th at p. 883.) Certainty as to the amount is not required; reasonable certainty is sufficient. (*Id.* at pp. 883–884.) These principles apply to both tort and contract cases. (*Id.* at p. 883.)

■ " '[I]f the business is a new one or if it is a speculative one . . . , damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.' " (*Kids' Universe, supra,* 95 Cal.App.4th at p. 884.) "[T]he experience of similar businesses is one way to prove prospective profits. [Citations.] Also relevant is whether the market is an established one. [Citations.]" (*Id.* at p. 885; see *S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp.* (1976) 58 Cal.App.3d 173, 184–185 [130 Cal.Rptr. 41].) " 'A plaintiff's [or a third party's] prior experience in the same [or similar] business has been held to be probative [citations]; as has a plaintiff's [or a third party's] experience in the same [or similar] enterprise subsequent to the interference. [Citations.]' " (*Kids' Universe, supra,* 95 Cal.App.4th at p. 886.) " 'Similarly, prelitigation projections, particularly when prepared by the defendant, have also been approved. [Citation.] The underlying requirement for each of these types of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.' [Citation.]" (*Ibid.*) " ' "[E]xpert testimony alone is a sufficient basis for an award of lost profits in the new business context when the expert opinion is supported by tangible evidence with a 'substantial and sufficient factual basis' rather than by mere 'speculation and hypothetical situations.' " [Citations.]' " (*Id.* at p. 885.)

We apply these principles to plaintiffs' evidence with respect to their claims for lost profits, lost franchise fees, and consequential expenses.

2. *Analysis*

   a. *Lost Profits*

■ Wunderlich calculated lost profits for restaurants located in The Block, Aliso Viejo, and Fresno. These had specific plans for opening, but

were unestablished businesses for which lost prospective profits are recoverable only " 'where the evidence makes reasonably certain their occurrence and extent.' [Citations.]" *(Kids' Universe, supra*, 95 Cal.App.4th at p. 883.) We conclude the evidence does not make this showing.

Wunderlich's calculations for these three locations relied on projections provided by Parlour, market data about Friendly's and a couple of dozen other ice cream parlors, plus the two open Farrell's. We discuss these in turn.

### (1) *Pro Forma Projections*

Defendants criticize Wunderlich's calculations for relying on "groundless proforma projections." (Boldface & capitalization omitted.) They contend the projections were speculative because they contained disclaimers stating the projections were "not based on actual operations," were not assured to "reflect actual results," and were "estimate[s] of start up expenses of the project." They further assert that Wunderlich "had no idea of the source of the projections (other than he received them from Parlour or its attorney). The expert did not know the qualifications, education or training, if any, of the person or persons preparing the projections or methodology used in preparing the projections." Defendant's contentions have merit.

The projections that formed the basis for Wunderlich's opinion were from an offering circular prepared by Parlour and given to potential investors. They were not based on actual operations, but rather consisted of Parlour's assumptions for the next five years. Each contained disclaimers that the income and expense estimates might not reflect actual results. The record does not reveal the method used to calculate the projections.

There is evidence that Paul Kramer, Parlour's chief operating officer and secretary, prepared the projections with the help of Court Huish, a Parlour officer. Kramer had been involved in the restaurant business for many years, actively overseeing the operation of numerous restaurants and participating in restaurant franchising. This experience gave him intimate knowledge of the industry, including raising capital, hiring staff, and providing proper training. Huish holds a master's degree in business administration and is also experienced in the restaurant business, including 18 years working for the Huish Family Fun Centers, during which time it purchased and sold franchises. Later Huish invested in and helped raise nearly $2 million for three fun centers in Idaho, Utah, and Colorado.

Despite their extensive experience, neither testified to any particular qualifications that would allow them to predict income, expenses, or profits for a Farrell's, as opposed to any other restaurant. Nor did anyone testify as to the

facts underlying the projections or the calculations used to prepare them. There was no testimony they based their predictions on the operation of the single Farrell's that Parlour was able to open in Santa Clarita or on any other actual numbers that would be reliable indicators of future income, expenses, or profits of a Farrell's in another city.

Kramer did testify that he consulted with Chan in preparing the projections. Chan admitted he had discussed the projections with Kramer and a Parlour shareholder, and that "we . . . backed into our numbers, . . . [meaning] we knew what we had to do in order for this to be economically viable." Chan further admitted that, "based on the fact that [the projections are] estimates, or proformas, you can't really say they're inaccurate. They could be optimistic, but they're not necessarily inaccurate." But none of this shows how the projections were actually calculated or upon what facts they were based.

Although prelitigation projections are relevant and admissible, especially when they are prepared by the defendant (*Kids' Universe, supra*, 95 Cal.App.4th at p. 886; *S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp., supra*, 58 Cal.App.3d at p. 185), the projections must nevertheless be based on *facts* that are substantially similar to the lost business opportunity. (*Kids' Universe, supra*, 95 Cal.App.4th at p. 886.) There is no evidence that was done here.

### (2) *Market Data for Friendly's and Ice Cream Parlors*

Wunderlich used the projections only as a starting point for his calculations. He also considered market data about "a couple of dozen ice cream parlors," plus a publicly traded restaurant chain called Friendly's, which he claimed was "relatively similar to the Farrell's concept." The only evidence of that, however, is Wunderlich's testimony that it "is a chain of about 300 or so restaurants, which is similar to Farrell's in that it has both the ice cream end and the food end." But many restaurants serve both ice cream and food. Although one way to prove prospective profits is through the experience of comparable businesses, Wunderlich's cursory description of Friendly's business model failed to establish its profit-and-loss experience is sufficiently similar to Farrell's to be relevant to the question of plaintiffs' alleged lost profits. (*Kids' Universe, supra*, 95 Cal.App.4th at p. 884.)

Nor have plaintiffs made this showing with respect to the dozen or so ice cream parlors whose market data Wunderlich considered. He himself admitted these ice cream parlors were smaller operations that served only ice cream and concluded they were not similar enough to the Farrell's concept, as he relied more on the data from Friendly's because it served both food and ice cream.

### (3)  *Data From Existing Farrell's and Other Businesses*

Wunderlich testified that he further considered financial information relating to the San Diego and Santa Clarita Farrell's, as well as industry data for a variety of businesses. But Wunderlich also admitted he did not use the actual numbers from the Santa Clarita location as a starting point for his lost profit estimates. As to the data from the San Diego Farrell's, all he did was speak to Parlour's principals about its revenues, expenses, and profits. There is no evidence as to what those numbers were or how they affected his calculations. The same problem exists with respect to industry data for the different businesses. Before evidence of similar businesses may be used to prove loss of prospective profits, there must be " 'a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.' [Citation.]" (*Kids' Universe, supra,* 95 Cal.App.4th at p. 886.) This requirement was not met.

### b.  *Lost Franchise Fees*

Wunderlich calculated Parlour's lost franchise fees for all eight locations. His computations included a $35,000 one-time charge for each of the seven proposed restaurants and a percentage of the total gross revenue estimated for all eight locations. The upfront charge was not recoverable against defendants and, except for the Santa Clarita location, neither were the fees based on a percentage of the revenue.

### (1)  *Upfront Charge*

For The Block at Orange, Parlour had entered into a subfranchise agreement with Fun Foods Block. The agreement declares, in relevant part, "Initial Franchise Fee. You'll pay us, on signing this Agreement, an initial franchise fee . . . . The initial franchise fee is fully earned by us on signing of this Agreement and is entirely nonrefundable . . . ." (Boldface & underscoring omitted.) Upon signing the agreement, therefore, Fun Foods Block immediately owed Parlour the initial fee. If Parlour never received that fee, its remedy is against Fun Foods Block, not defendants.

As to Aliso Viejo, both parties initially asserted in their briefs that Fun Foods 1 had entered into a subfranchise agreement with Parlour. The cited portions of the record, however, do not substantiate that assertion. In their supplemental letter brief, defendants claim "[t]here was never a signed [subfranchise] agreement . . . for Aliso Viejo." That statement is also not supported by defendants' record citations.

Either way, Parlour was not entitled to recover the $35,000 initial fee from defendants. If the parties had entered into a subfranchise agreement

before the ADA was terminated, the initial fee would have been owed by Fun Foods 1. If no subfranchise agreement was entered before then, Parlour had to prove such an agreement was likely. The evidence, however, shows Parlour did not obtain a lease for the Aliso Viejo site because the landowner sold the property to a buyer other than the prospective lessor with whom Parlour was negotiating. There is nothing in the record indicating that Parlour was negotiating with the buyer of the property or at another nearby location. Absent such evidence, Parlour's ability to enter into a subfranchise agreement and recover the initial fee was entirely speculative.

Regarding Fresno, Parlour demonstrated it had an investor who was "moving forward" and that he had "the franchise documents and is preparing the lease for the location . . . ." But there was also evidence that Chan would not approve the Fresno site because he "believe[d] that . . . moving forward with [it was] premature . . . ." Without Chan's approval, no subfranchise agreement could be entered into at that time.

Subfranchise agreements were also speculative with respect to the remaining four locations. Although Parlour and Power House, the company with whom Parlour was collaborating, had informally agreed to build restaurants in four cities, specific locations had not yet been chosen. Moreover, defendants presented evidence they would never have approved the proposal to build the four restaurants because Power House wanted a "package" deal. This included a requirement that Chan sign an estoppel agreement, which he would not do. Power House stated that defendants' refusal to sign the estoppel agreement was a "real problem for [it]." Perhaps the parties could have come to an agreement if allowed more time to negotiate, but at the time the ADA was terminated, it was speculative whether Parlour would have been able to secure signed franchise agreements for the four locations.

(2) *Percentage of Gross Revenue*

Because revenue to be recovered at the four Power House locations was speculative, franchise fees based on a percentage of the projected gross revenue were not recoverable from defendant. Parlour maintains "[t]he same cannot be said for the lost royalties [it] is entitled to recover from Santa Clarita, The Block, Aliso Viejo and Fresno." According to Parlour, "Wunderlich used the actual revenue figures for Santa Clarita in determining his projected lost royalties for Santa Clarita; they were also an integral part of forming his projected lost royalties for The Block, Aliso Viejo and Fresno. Therefore, unlike the lost profits, they are not speculative and [it] is entitled to recover them." (Italics omitted.)

Leaving aside for the moment Parlour's questionable ability to proceed with the Aliso Viejo and Fresno locations, Wunderlich specifically testified he

did *not* use the actual revenues from the Santa Clarita Farrell's in calculating lost franchise fees for The Block, Aliso Viejo, and Fresno. For those locations he used the projections provided by Parlour. Because there is no evidence those projections were based on actual numbers or other factors that could reliably predict future income, the revenue prophesized in the projections is conjectural at best. Parlour cannot recover a percentage of speculation.

Wunderlich did rely on the actual revenues and growth rate of the Santa Clarita Farrell's to calculate lost franchise fees for that restaurant. Unlike the proposed restaurants, therefore, the projected gross revenues for the Santa Clarita location were reasonably certain.

The Santa Clarita subfranchise agreement entitles Parlour to recover a percentage "of the Gross Volume received or earned . . . on a monthly basis." "Gross Volume" is defined as including "*all revenues* (except sales tax collected and paid to the appropriate taxing authority and actual customer refunds, adjustments and credits)[,] *which are or could be received or earned*" by the subfranchisee "with respect to [the] Farrell's Business[.]" (Italics added.) The agreement further provides, "All sales and/or billings, whether collected or not, will be included in Gross Volume, with no deduction for credit card or other charges." Under a plain reading of the contract, the parties agreed to calculate the franchise fee by taking the designated percentage from all gross revenue, earned or earnable, collected or not, without consideration of expenses.

Kirin's breach of contract, as found by the jury, prevented Parlour from continuing to receive the franchise fees it was entitled to under the Santa Clarita subfranchise agreement. The parties agree Wunderlich determined those lost franchise fees to be $89,868. In doing so, he followed the terms of the subfranchise agreement and took a percentage of the gross revenues projected for the Santa Clarita Farrell's.

Conceding "its expenses . . . would reduce the royalties it could recover" (see *Electronic Funds Solutions v. Murphy, supra,* 134 Cal.App.4th at p. 1180 [damages in injury to business cases consist of net profits]), Parlour submits it provided evidence of its expenses, including salaries and royalty payments to Kirin, and during closing argument, explicitly told the jury to deduct the present value of the expense stream from the amount calculated by Wunderlich. Parlour also calculated its lost royalties by reducing them to present value. According to Parlour, the jury apparently considered the evidence and argument and awarded it an amount that renders its " 'costs of revenue' " at approximately 30 percent. Parlour concludes, "Based on the projected lost royalties and proportional expenses," its recoverable net lost royalties for Santa Clarita are $62,907, or 70 percent of the $89,868 calculated by Wunderlich.

Defendants' only argument with respect to the lost franchise fees for the Santa Clarita location is that Wunderlich's calculation of $89,868 "ignores the actual revenue history which showed revenues declining from 2003 to 2004 . . . ." But the mere fact that revenues declined one year does not demonstrate Wunderlich ignored that history. Wunderlich testified he considered the actual revenues of the Santa Clarita Farrell's to determine Parlour's lost franchise fees for that restaurant. That is sufficient. Absent any reasoned argument from defendants why the amount requested by Parlour should not be awarded, we affirm the judgment to the extent it includes an award of $62,907 for lost franchise fees with respect to Santa Clarita.

 c. *Extra Expenses*

Wunderlich's calculations included $202,929 in extra expenses incurred by plaintiffs. To arrive at this number, Wunderlich examined plaintiffs' bank records and added up the expenditures they paid in developing the different locations. He concluded Parlour, Fun Foods Block, and Fun Foods 1 had sustained expenses totaling $67,348, $126,486, and $9,095, respectively. These amounts are based on concrete evidence and are reasonably certain. Wunderlich's calculation of extra expenses is thus supported by substantial evidence.

■ Defendants concede Parlour is entitled to recover its expenses of $67,348 as contractual damages. (See *Buxbom v. Smith* (1944) 23 Cal.2d 535, 541 [145 P.2d 305] [when party to contract prevents other party from performing, " 'primary measure of damages is the amount of his loss, which may consist of his reasonable outlay or expenditure toward performance' "]; *Gollaher v. Midwood Constr. Co.* (1961) 194 Cal.App.2d 640, 649 [15 Cal.Rptr. 292].) They contend, however, that Fun Foods Block and Fun Foods 1 are not entitled to their expenses because they were not parties to any contract with defendants and their tort claim for intentional interference with economic advantage is not supported by substantial evidence. We agree.

■. Two of the elements of a cause of action for intentional interference with prospective economic advantage are conduct by the defendant that is wrongful beyond the interference itself (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740]; see also *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 241 [26 Cal.Rptr.3d 798]) and proximate causation, i.e., a reasonable probability the lost economic advantage would have been realized but for the defendant's wrongful acts. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 [131 Cal.Rptr.2d 29, 63 P.3d 937]; *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 271 [45 Cal.Rptr.2d 90]; see also *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 391

[10 Cal.Rptr.3d 429] [causation element of an interference with prospective economic relations " 'is something that is a substantial factor in bringing about an injury, damage, loss or harm' "].)

The Fun Foods plaintiffs contend defendants' "numerous misrepresentations" (concealment of defendants' negotiations with a third party to build competing restaurants and false representations sites for The Block and Aliso Viejo were approved) and their expert's testimony that "[d]efendants committed numerous acts that fell below the 'established standard' of care for a reasonable franchisor" satisfy the independent wrong element. We question whether the expert's testimony suffices to show defendants committed an independent wrong. (See *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1259 [116 Cal.Rptr.2d 358] [rejecting "nebulous 'industry standards' test" on grounds "[t]he imposition of liability for interference based merely on opinions that the solicitation of a competitor's business was 'unethical' or violated 'industry standards' would create uncertainty and chill, not maximize, competition"]; cf. *Stevenson Real Estate Services, Inc. v. CB Richard Ellis Real Estate Services, Inc.* (2006) 138 Cal.App.4th 1215, 1222 [42 Cal.Rptr.3d 235] ["[u]nlike the opinion testimony relied upon by the plaintiff in *Gemini*, the Association's Rules are written and presumably made available to all Association members" and "therefore cannot be deemed nebulous"].) But we need not decide the issue or determine whether the evidence was sufficient to support the fraud and negligent misrepresentation causes of action because we conclude there is no evidence defendants' alleged conduct was the proximate cause of the Fun Foods plaintiffs' lost economic advantage.

Fun Foods 1 lost its potential economic advantage with Parlour when the potential owner of the Aliso Viejo site, with whom Parlour was negotiating the lease, elected not to purchase the property, not because of any misrepresentations or other misconduct by defendants. Because Parlour was only negotiating with a potential buyer of the property, we reject Fun Foods 1's argument that "had Kirin approved the site in April[] and allowed plaintiffs to sign the already negotiated lease, any subsequent sale would have been subject to the lease already in place."

Similarly, notwithstanding alleged misconduct on defendants' part, the record shows Parlour continued to move forward with respect to The Block up until at least the day before, if not the day, defendants terminated the ADA. Given such evidence, it cannot be said it was defendants' misrepresentations or conduct falling below the standard of care that caused the disruption of Fun Foods Block's relationship with Parlour and resulted in a lost economic advantage.

Fun Foods 1 and Fun Foods Block are not entitled to recover their extra expenses incurred in developing the different locations. The judgment is affirmed to the extent it includes an award of $67,348 to Parlour for its expenditures.

## DISPOSITION

The judgment in favor of Fun Foods 1 and Fun Foods Block on the cause of action for intentional interference with prospective economic advantage is reversed. The matter is remanded to the trial court with directions to reduce the award of damages to Parlour and against Kirin to $130,255. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

Sills, P. J., and Fybel, J., concurred.