UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1848

JOHN M. COHEE, JR., trading as Cohee Farms; DIANA B. COHEE, trading as Cohee Farms,

Plaintiffs - Appellees,

v.

GLOBAL HORIZONS INCORPORATED, doing business as AgriLabor,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.    William D. Quarles, Jr., District Judge.  (1:05-cv-03359-WDQ)

Argued:  December 3, 2008          Decided:  February 6, 2009

Before NIEMEYER and MICHAEL, Circuit Judges, and Rebecca Beach SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Matthew S. Gibbs, Los Angeles, California, for Appellant.  Craig Forrest Ballew, FERGUSON, SCHETELICH & BALLEW, P.A., Baltimore, Maryland, for Appellees.  **ON BRIEF:** Chrystal L. Bobbitt, LITIGATION COUNSEL FOR GLOBAL HORIZONS, INC., Los Angeles, California, for Appellant.  Tracey Dallahan-McLauchlin, FERGUSON, SCHETELICH & BALLEW, P.A., Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellees John M. Cohee, Jr., and his wife, Diana B. Cohee, operate Cohee Farms in Preston, Maryland. (We refer to the appellees as "Cohee.") The present dispute involves a contract between Cohee and appellant Global Horizons, Inc. ("Global"), in which Global agreed to provide Cohee a labor force to harvest watermelon and sweet corn in 2005. Global failed to furnish the promised labor because it could not find housing in the area for its workers. Cohee sued Global for breach of contract in state court, and the action was removed to U.S. District Court on the basis of diversity jurisdiction. A jury determined that the contract was breached and awarded Cohee damages that included lost profits for 2005 and future profits for 2006 and 2007. Global argues that it did not breach any obligation to Cohee because it was not responsible for housing. It also challenges the damages awarded to Cohee on several bases. For the reasons below, we affirm.

I.

We recount the evidence, presented in a four-day trial, in the light most favorable to Cohee, who obtained a favorable verdict. Global is a California corporation that provides foreign agricultural labor to farmers in the United States. Foreign agricultural workers are eligible to enter the

3

United States on a temporary basis through the H-2A visa program. The process of securing H-2A visas is sufficiently complex that Global has a customer base of farmers who are willing to pay Global to navigate that process for them. In late 2003 or early 2004 Global met with several Maryland farmers to provide them information about the availability of H-2A labor and about Global's services. Cohee was among those in attendance.

In need of labor, Cohee entered a contract with Global for H-2A labor for his 2004 harvest, and Global provided the laborers needed. In early 2005 Cohee again decided to use H-2A labor furnished by Global for that year's harvest. In March 2005 the parties executed the Farm Labor Contractor H-2A Agreement (the Agreement), drafted by Global, that is at issue in this case. Around April 1, 2005, Cohee began planting 55 acres of watermelon and 65 acres of sweet corn.

Under the Agreement Global committed to furnish labor "at its own expense" to Cohee from June 25, 2005 through September 10, 2005. J.A. 695. The Agreement left open the number of workers required by Cohee, but Cohee requested ten workers in a separate letter of intent that was signed the same day as the Agreement. In return Cohee promised to pay Global an agreed upon hourly wage for each worker plus a certain surcharge. The Agreement provided that the surcharge would be

4

35 percent if Cohee provided transportation and housing to the workers; 40 percent if Global provided either transportation or housing; and 45 percent if Global provided both transportation and housing. Although Cohee had housed workers in a farmhouse on the property and paid a surcharge of 35 percent in 2004, the farmhouse was torn down after the 2004 harvest. Cohee says that when he approached Global about providing his labor force for the 2005 harvest, he informed Global that he could not provide housing for the laborers during that harvest season. By regulation, housing must be provided to H-2A workers at no cost to the workers. See 20 C.F.R. § 655.102(b).

Global investigated housing possibilities near Cohee Farms during the spring and summer of 2005. In late spring Global inquired about prices at local hotels and booked rooms at the local Econo Lodge Motel, although Global representatives later asserted that that arrangement was always intended to be temporary. In late June Global sent a representative to Cohee Farms and the surrounding area to search for an affordable place to house the workers. Despite these efforts, Global contacted Cohee in late June and, citing difficulties in securing housing, asked to push back the start date from June 25 to July 1. Cohee agreed to the postponement.

Global failed to furnish Cohee with any labor as of July 1 or at any other point during the 2005 harvest. During

5

Cohee's multiple conversations with Global representatives in June, July, and August about his pressing need for workers, Global representatives informed Cohee that Global "had workers ready to come, but they . . . didn't have any housing." J.A. 848.

Without his anticipated labor force, Cohee turned to family and neighbors for help harvesting his crops. A cousin was able to locate a source of labor in Delaware in mid-July, and five to ten workers began traveling from Delaware to Cohee Farms each day to help with the harvest. In mid- to late July or August, a neighbor with a larger farming operation began loaning Cohee between six and twenty-six workers, but only for a few hours each morning. And through a different neighbor, Cohee worked out an arrangement with a broker, C & L Packing, to harvest part of the Cohee Farms watermelon crop in exchange for a favorable price for the watermelons and a broker's fee for the neighbor who arranged the transaction. According to Cohee, the assistance he received in harvesting "did not even come close" to replacing the workers that Global had contracted to provide. J.A. 855. Roughly fifty percent of his crop was left in the field unharvested at the end of the season.

As a result, Cohee had "nowhere close" to enough sweet corn or watermelon to satisfy his direct market and wholesale customers. J.A. 862. Because of Cohee's inability to meet

6

customer demand in 2005, he lost some of his direct market and wholesale customers. In the next season (2006) Cohee decided to grow small grains instead of the more profitable watermelon and sweet corn because of a combination of factors, including the damage that Global had caused to his customer base and independent concerns about the availability of labor that season. Cohee's profits in 2006 and 2007 were reduced as a result, and a sweet corn packaging shed that Cohee had built was rendered useless.

At the conclusion of Cohee's evidence, Global moved for judgment as a matter of law, and the motion was denied. The jury found Global in breach of its contract with Cohee and awarded Cohee $490,000 for lost profits in 2005, $37,186 for unnecessary expenses in 2005, $150,000 for lost profits in 2006, and $142,500 for lost profits in 2007. Following the verdict Global renewed its motion for judgment as a matter of law and alternatively moved for a new trial. Global also filed a motion to alter or amend the judgment. The district court denied each of these motions. Global now appeals.

## II.

Global makes several arguments on appeal. First, it argues that the jury improperly found that it breached the Agreement. Second, it argues that any consequential damages

awarded by the jury were improper because the terms of the Agreement, which is governed by California law, prohibited consequential damages. Third, Global argues that each of the specified damages awards -- lost profits in 2005, 2006, and 2007 and unnecessary expenses incurred in 2005 -- were improperly awarded.

We review de novo the district court's denial of Global's motion for judgment as a matter of law. Adkins v. Crown Auto, Inc., 488 F.3d 225, 231 (4th Cir. 2007); Brown v. CSX Transp., Inc. 18 F.3d 245, 248 (4th Cir. 1994). "A court may award judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 147 (4th Cir. 2008). And the court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. Dennis v. Columbia Colleton Medical Ctr. Inc., 290 F.3d 639, 645 (4th Cir. 2002).

We review the district court's decision not to order a new trial for clear abuse of discretion, and we will not reverse the decision absent exceptional circumstances. Id. at 650; Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir. 1994). A new trial is only appropriate when "an error occurred in the conduct of the trial that was so

8

grievous as to have rendered the trial unfair." Bristol Steel & Iron Works, 41 F.3d at 182 (quoting DMI, Inc. v. Deere & Co., 802 F.2d 421, 427 (Fed. Cir. 1986)).

We review the denial of a Rule 59(e) motion to alter or amend judgment for abuse of discretion. Bogart v. Chapell, 396 F.3d 548, 555 (4th Cir. 2005). There are only three grounds for granting such a motion: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998).

A.

Global first argues that it did not breach the Agreement with Cohee because it was not obligated under the Agreement to provide housing to its H-2A workers. Rather, Global contends that it had the option to provide housing, but if it elected not to provide housing, Cohee was responsible for providing it. In rejecting Global's post-trial motions, the district court determined that the Agreement "place[d] the burden of securing worker housing squarely on Global Horizon's shoulders." Cohee v. Global Horizons, Inc., No. WDQ-05-3359 (D. Md. July 19, 2007); J.A. 1412. Under California law, which governs here, "[i]f contractual language is clear and explicit,

9

it governs." Powerine Oil Co., Inc. v. Superior Court, 118 P.3d 589, 598 (Cal. 2005).

The language is sufficiently clear and explicit if it is not reasonably susceptible to materially different meanings. Hayter Trucking, Inc. v. Shell W. E&P, Inc., 18 Cal. App. 4th 1, 15 (Ct. App. 1993). Moreover, "[l]anguage in a contract must be construed in the context of that instrument as a whole." Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263, 1271 (Cal. 1993) (emphasis removed). We conclude as a matter of law that the language of the Agreement, particularly when construed as a whole, is sufficiently clear to obligate Global to provide housing.

The Agreement is an H-2A labor agreement under which Global committed to providing labor "at its own expense." J.A. 695. The Agreement's specific provisions make clear that it allocated to Global the responsibility for all of the specific expenses attendant to providing H-2A labor. There are no exceptions to the expenses Global agreed to cover when it agreed to provide labor "at its own expense," much less an exception that might reasonably be read as carving out responsibility for housing costs. See J.A. 695. The Agreement provided that Global was solely responsible for paying the salaries, benefits and "all other expenses relating to [its] workers." J.A. 696. Global also agreed to "provide, at its sole expense, whatever

10

ancillary support, equipment, supplies, transportation and facilities as required by law and for its workers to adequately and properly perform their respective tasks." J.A. 696. These laundry lists of expenses include a number of broad categories, such as "ancillary support" and "facilities," that, read in the context of the Agreement as a whole, indicate that the agreement was intended to include housing expenses. Moreover, Global represented in the Agreement that it would comply with all applicable laws and regulations, including H-2A visa program regulations, which require that housing be provided to H-2A workers at no cost to the workers. Global's representations in the Agreement that "[t]he housing provided to [its] workers[] meets or exceeds all legal requirements," J.A. 697, would be odd if the Agreement did not also contemplate that Global was responsible for housing.

Global argues that the Agreement's integration clause precluded the introduction of any extrinsic evidence that might have indicated that the parties intended for Global to provide housing. The integration clause states that the Agreement is the "entire agreement between the parties hereto, and there have been no oral or written representations affecting this Agreement, or the provisions hereof, except as set forth herein." J.A. 699. Of course, in the case of an ambiguity, California law allows the admission of extrinsic evidence when

11

it "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Dore v. Arnold Worldwide, Inc., 139 P.3d 56, 60 (Cal. 2006); Pac. Gas & Elec., Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641, 644 (Cal. 1968). Even if we assumed an ambiguity with respect to the obligation to provide housing, the extrinsic evidence at trial permitted a reasonable finding that at the relevant times Global interpreted the Agreement as assigning to it the housing obligation.

The notice of deposit requirement that Global drafted and required Cohee to sign revealed that Cohee was responsible for paying a deposit calculated using an anticipated surcharge of "45% (housing and transportation)." J.A. 27 (emphasis added). Further, Cohee sent Global's president a letter to confirm several details pertaining to the Agreement. That letter included the following sentence: "The workers will be recruited, housed, transported, paid, and supervised by Global Horizons, Inc." J.A. 28 (emphasis added). Global negotiated with a local Econo Lodge to provide housing for the workers. In late June 2005 Global sent a representative to Maryland to look for additional housing possibilities for its workers. Finally, Global sought Cohee's permission to delay the arrival of the workers until it was able to secure housing. Insofar as the Agreement leaves any room for ambiguity, extrinsic evidence was

12

admissible, and that evidence makes clear that both parties understood that Global would provide housing under the 2005 Agreement.

Global contends that one provision in the contract, paragraph 8(iv) reserved to it the option to determine whether or not it would provide housing. That paragraph provides that if transportation or housing is provided by Global, Cohee would pay a 40 percent surcharge (instead of 35 percent) against the applicable wage rate. The surcharge is 45 percent if Global provided both transportation and housing. Read in the context of the other contractual provisions that assigned to Global the ultimate responsibility to provide housing, paragraph 8(iv) simply gave Cohee the option to provide housing, an option he exercised in the 2004 season. Before the Agreement was signed, Cohee advised Global that he could not provide housing in 2005.

We conclude that the district court did not err when it concluded that the Agreement made Global responsible for providing H-2A labor and for satisfying the attendant expenses of making that labor available. This responsibility, the district court properly determined, included the ultimate responsibility to provide housing. There was sufficient evidence to support the jury's finding that Global breached the agreement to provide housing.

B.

Global also argues that the jury should not have been permitted to award consequential damages because the Agreement expressly precluded liability for such damages. For this argument Global relies on paragraph 8(g) of the Agreement, which provides as follows:

> If the CLIENT is delayed in making any payments due to [Global] hereunder, [Global] reserves the right to remove its workers and cease providing Services hereunder, until such balance has been paid by CLIENT. Payment for work performed and hours lost will be the responsibility of the CLIENT. In no event shall [Global] be held responsible or liable for any consequential or incidental damages, including without limitation any lost profits that CLIENT may suffer as a result of [Global]'s actions under this Agreement.

J.A. 698. Global argues that the last sentence of paragraph 8(g) limits its liability. Global is correct that "limitation of liability provisions have long been recognized as valid in California." Markborough Cal., Inc. v. Superior Court, 227 Cal. App. 3d 705, 714 (Ct. App. 1991). Here, however, the last sentence of paragraph 8(g) is not a broad limitation of liability.

As noted above, "the context in which a term appears is critical." Century Transit Sys., Inc. v. Am. Empire Surplus Lines Ins. Co., 42 Cal. App. 4th 121, 126 (Ct. App. 1996) (emphasis in original). Like the district court, we conclude that the context in which the liability limitation provision

14

appears indicates that it has narrow applicability. If the parties intended a broad liability limitation, paragraph 8(g) was not the appropriate place in this agreement for it. Paragraph 8 addresses the subject of Global's "compensation," and paragraph 8(g), where the liability limitation appears, is a narrow provision that addresses the consequences when Cohee is delayed in making payments to Global. If the parties had intended a broad provision limiting liability for damages, the proper place for it would have been paragraph 9. Paragraph 9 is entitled "Governing Law and Waiver," and it contains three stand-alone provisions that are broadly applicable to all litigation and legal disputes arising under the Agreement: (a) California law governs the Agreement, (b) the prevailing party in any litigation with respect to the Agreement will be entitled to costs and expenses, including reasonable attorneys' fees, and (c) Cohee may not deduct damages from amounts owed on Global invoices. On the other hand, paragraph 8, which includes the liability limitation sentence, is titled "Compensation," and its provisions are essentially limited to that topic. Its provisions address such issues as Global's rates and fees and when billing invoices become due. If the parties had agreed on a broadly applicable liability limitation, common sense dictates that it would appear in paragraph 9. The fact that the limitation on liability provision was the third sentence of

15

paragraph 8(g) -- relating to Global's right to withdraw workers in the event of delay in the payment of its compensation -- suggests that the provision has a narrow application.

The provisions in paragraph 8 that surround paragraph 8(g) fit a pattern that further supports the narrow reading of the liability limitation. The previous paragraph, 8(f), provides that Global will submit a bill every Tuesday and that Cohee must pay all undisputed amounts within two days of the billing date. But in the event of a dispute "arising from the billing statements," the final sentence of paragraph 8(f) provides: "the parties shall meet and use their best efforts to resolve the matter in question." J.A. 698. Paragraph 8(h) provides for a two percent finance charge for overdue invoices. It then provides for the possibility that "said percentage [is] considered under any applicable law to be usurious or otherwise illegal." J.A. 698. In that event, according to the last sentence of paragraph 8(h), "the percentage shall be automatically adjusted to the maximum rate allowed by law." J.A. 698. Both paragraphs 8(f) and 8(h) state the parties' intentions with respect to an aspect of or obligation related to compensation and then provide for the possibility and resolution of a dispute as to that <u>specific</u> aspect or obligation.

Especially given the incongruity of appending a broad limitation on liability to a narrow compensation-related

provision, paragraph 8(g) ought to be read to follow the same pattern as paragraphs 8(f) and 8(h). Like the final sentences in paragraphs 8(f) and 8(h), the final sentence of paragraph 8(g) provides for the possibility of a dispute concerning the obligations contained earlier in the same paragraph -- a dispute arising from Global's removal of workers due to a delayed payment. In that event alone, Global is not "responsible or liable for any consequential or incidental damages, including without limitation any lost profits that [Cohee] may suffer as a result of [Global']s actions under this Agreement." J.A. 698. Because the dispute here did not involve the situation contemplated by paragraph 8(g) -- Global's removal of workers due to late payment by Cohee -- consequential damages were available.

## C.

Global also separately challenges each of the specific categories of damages awarded on the grounds that the evidence was insufficient and that certain damages were too speculative and were not reasonably foreseeable to Global.

## 1.

With respect to the $490,000 awarded for lost profits in 2005, Global argues that these damages were "speculative because they were based solely on the hypothetical value of what plaintiff might have earned if he had been able to harvest all

17

of his crops." Appellant Br. at 21. Global does not question whether the evidence submitted as to the expected yield or prices for watermelon and sweet corn were ascertainable with reasonable certainty in 2005, the standard for determining whether damages are speculative or not. See Parlour Enters., Inc. v. Kirin Group, Inc., 152 Cal. App. 4th 281, 287-88 (Ct. App. 2007). Instead, Global argues that the jury calculated damages assuming that Cohee would have harvested all 120 acres of watermelon and sweet corn planted if Global had not breached, yet there was not sufficient evidence to establish that 120 acres of the two crops would have been harvested. Global failed to raise this argument before the district court, and we decline to find error, much less plain error. First, the jury did not necessarily assume that all 120 acres would have been harvested but for Global's breach. The verdict form reflected the jury's determination that Cohee suffered $490,000 in lost profits in 2005, but not how the jury determined that figure. The evidence supports a finding of $490,000 in damages even absent a determination that 120 acres of sweet corn and watermelon would have been harvested but for the breach. Cohee's expert calculated $492,811 in lost profits in 2005, using conservative estimates with respect to corn prices and watermelon yield.

Further, there was sufficient evidence for a reasonable juror to conclude that all 120 acres would have been

18

harvested absent Global's breach.  Cohee indicated to Global his need for ten H-2A workers on March 28, 2005.  Cohee then began planting his sweet corn and watermelon crops "by the last of March or the 1st of April."  J.A. 807.  There was thus a basis for the jury to find that Cohee would not have planted more acres than he would be able to harvest with the ten-person labor force he anticipated.  This is true even though Cohee was unable to harvest 120 acres despite ultimately getting between five and ten workers each day from Delaware and between five and twenty-six workers for several hours each day from a neighbor.  These workers became available late in the harvest season, and the laborers that Cohee secured from his neighbor only worked for several hours a day.  We have no basis for concluding that the $490,000 damages award for 2005 amounted to plain error.

2.

Global also challenges the damages awarded for future lost profits in 2006 and 2007 as speculative and unsupported by the evidence.  Global raised these arguments before the district court in its post-trial motions.  Global first argues that the evidence is not sufficient to support the jury's implicit finding that Global's breach caused Cohee to stop growing sweet corn and watermelon.  According to Global, the evidence shows that Cohee decided to stop growing those crops because he was concerned about the availability of a labor force, not because

19

he had lost his customer base.  While the record does contain some evidence from which a juror could make such a finding, the jury in this case obviously made a different finding.  It found that Cohee stopped growing sweet corn and watermelon because of Global's breach and the consequences of that breach.

There was sufficient evidence to support the jury's finding.  Three farmers, including Cohee, testified that direct market and wholesale customers will not give a farmer who "drops the ball" a second chance.  J.A. 945.  A gap in a farmer's product supply will likely result in direct market and wholesale customers buying elsewhere.  Indeed, Cohee testified that he was not prepared to grow sweet corn or watermelon in 2006 because of a combination of factors including the damage that Global had caused to his direct market and wholesale customer base. The jury was free to credit this testimony rather than certain other evidence relied upon by Global.

Global also argues that the damages awarded for lost profits in 2007 were overly speculative because Cohee's expert did not quantify a damages estimate for 2007.  But California courts have upheld damages awarded for future lost profits in the case of an established business.

> Where an established business's operation is prevented or interrupted, "damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained

20

with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales."

Parlour Enters., Inc., 152 Cal. App. 4th at 287 (quoting Kids' Universe v. In2Labs, 95 Cal. App. 4th 870, 883 (Ct. App. 2002)).

Cohee Farms is an established business, and Cohee introduced evidence about his "past volume of business and other provable data relevant to the probable future sales." Parlour Enters., Inc., 152 Cal. App. 4th at 288. There was evidence that Cohee planted about 55 acres of watermelon per season, produced an average yield of 40,000 pounds of watermelon per acre, received at least 10 cents per pound, and paid around $1,800 per acre for labor. Similarly, the record contains evidence that Cohee planted about 65 acres of sweet corn per season; produced an average yield of 1,500 dozen ears of sweet corn per acre, received $2 per dozen ears, and paid $1,200 per acre for labor. Using these average yields and prices, Cohee's expert was able to estimate the damages that Cohee suffered by planting less profitable crops in 2006. Using the same data, the jury could itself estimate damages for 2007.

Global correctly notes that the expert witness did not himself calculate estimated lost profits for 2007, but the expert testified that "there is a strong probability that [Cohee's] earnings have been adversely affected prospectively [beyond 2006]." J.A. 995. He also testified that his analysis

21

for 2006 was relevant to future years. This testimony is sufficient to demonstrate the occurrence of lost profits in 2007, and the data relating to average yield and pricing provided the data necessary to calculate the extent of those damages to a reasonable certainty.

3.

Global's final argument is that the award of $37,186 for unnecessary expenses incurred in 2005 should be reversed. Cohee recovered damages for the unnecessary expenses he incurred because the sweet corn packaging facility he built in 2004 suffered diminished utility as a result of Global's breach. Global argues on appeal that this damages award was improper for two reasons: (1) there was insufficient evidence of a causal connection between Global's breach and the damages awarded and (2) those damages were not reasonably foreseeable to Global.

Because Global failed to raise these arguments before the district court, we review for plain error. In this analysis we inquire whether "(1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) . . . the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Celotex Corp. v. Rapid Am. Corp., 124 F.3d 619, 630-31 (4th Cir. 1997). We find no plain error with respect to Global's challenge to the sufficiency of the evidence as to causation. For the same reasons the evidence

22

bore out a causal connection between Global's breach and lost profits in 2006 and 2007, the evidence establishes a causal connection between the breach and the alleged damage due to unnecessary expenses. Cohee was forced to stop growing sweet corn and watermelon as a result of Global's breach, thereby diminishing the utility of Cohee's sweet corn packaging facility. The evidence supporting these determinations is sufficient to withstand plain error review.

We also decline to find plain error with respect to whether the diminished utility of the packaging facility was reasonably foreseeable to Global at the time of formation of the Agreement.

> [S]econdary or derivative losses arising from circumstances that are particular to the contract or to the parties . . . are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test).

Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist., 102 P.3d 257, 261 (Cal. 2004). There is no evidence that Cohee in fact informed Global that he had constructed a sweet corn packaging shed -- evidence which would have satisfied the subjective test. The question is thus whether Global ought to have been aware that Cohee would suffer losses to sweet corn-specific investments by its breach. It is not a stretch to

23

conclude that anyone (such as Global) supplying labor to harvest sweet corn would know that a packing shed would be a routine expense for the grower.

But even if we assume that these losses were not reasonably foreseeable, that it was plain error for the district court to submit the foreseeability issue to the jury, and that the error affected Global's substantial rights, we decline to conclude that any error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." Celotex Corp., 124 F.3d at 631; see also Matco Mach & Tool Co. v. Cincinnati Milacron Co., 727 F.2d 777, 781 (8th Cir. 1984) (declining to find that error in damages instruction to jury "seriously affected the fairness of the proceedings"). Not only did Global fail in district court to argue lack of foreseeability as a matter of law, it failed to raise factual arguments about foreseeability during the trial. The jury found by a preponderance of the evidence that "both parties could have reasonably foreseen the harm as the probable result of the breach." J.A. 761 (Jury instruction no. 14). As a result, we perceive no serious effect on the fairness of the proceedings. We thus conclude that it was not plain error for the district court to submit the issue of packing shed damages to the jury.

24

* * *

The judgment is

AFFIRMED.